**Syed T. AHMAD, Plaintiff,**

v.

**NASSAU HEALTH CARE CORPORATION, Anthony Angelo and Jacob Sokol, Defendant(s).**

**No. 00 CV–7549(TCP).**

United States District Court, E.D. New York.

Nov. 12, 2002.

Alan Wolin, Wolin & Wolin, Jericho, NY, for Plaintiff.

Amy L. Ventry, Nixon Peabody LLP, Garden City, NY, for Defendants.

## MEMORANDUM AND ORDER

PLATT, District Judge.

Before this Court is a motion by defendants Nassau Health Care Corporation, Anthony Angelo, and Jacob Sokol (hereinafter collectively "Defendants") for summary judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, dismissing the Complaint of Syed T. Ahmad in its entirety on the grounds there are no genuine issues of material fact for trial.

For the following reasons, Defendants' motion is GRANTED in full, and Defendants are awarded their costs.

### BACKGROUND

The facts are derived from the parties' Local Rule 56.1 Statements and are not in dispute except as noted.

Plaintiff Syed Ahmad, M.D. ("Dr. Ahmad" or "Plaintiff") was terminated from his employment with defendant Nassau Health Care Corporation ("NHCC") on February 16, 2000. In this action, Dr. Ahmad alleges that his termination from NHCC was discriminatory based on his race, national origin (Pakistani), and religion (Muslim) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and the New York State Human Rights Law, N.Y. Exec. L. § 296 ("NYSHRL"). Defendants deny any discriminatory action against Plaintiff and assert that Dr. Ahmad's termination occurred only after a determination by defendants Anthony Angelo ("Dr.Angelo") and Jacob Sokol ("Dr.Sokol") that Plaintiff intentionally withheld material information from his re-credentialing application for medical staff privileges in order to conceal accusations of negative professional conduct.

NHCC is a public benefit corporation with its principal offices located in Nassau County, New York. Effective September 29, 1999, various healthcare facilities and operations previously owned and operated by Nassau County were transferred to NHCC. Among those facilities transferred was the Nassau University Medical Center ("the Medical Center"), formerly the Nassau County Medical Center. From September 29, 1999 until his termination in February 2000, NHCC was Plaintiff's employer.

Plaintiff Dr. Ahmad is originally from Pakistan, is non-white, and is of the Muslim faith. He is a duly licensed physician in the State of New York and has been so licensed since 1993. In or about October 1994, Dr. Ahmad commenced employment as a full-time salaried physician in the Medical Center's Center of Primary Care ("COPC"). COPC is an outpatient primary care clinic that is located within the Medical Center. Plaintiff remained employed as a full-time Attending Internist in COPC during his entire employment at

188

NHCC. His duties included attending to patients on the hospital floor, in nursing homes, and in satellite clinics.

Defendant Dr. Jacob Sokol was born in Germany and is of the Jewish faith. Dr. Sokol was at all relevant times the Chair of Ambulatory Services, of which COPC is a part. Plaintiff's supervisor, Dr. Bella Silecchia ("Dr.Silecchia"), reported directly to Dr. Sokol. There is disagreement between the parties as to whether or not Dr. Sokol was the Medical Center official who hired Plaintiff. Defendants claim Dr. Sokol interviewed Dr. Ahmed and recommended that he be hired. Plaintiff contends he was interviewed by Dr. Silecchia and Dr. Sokol, but it was Dr. Faroque Kahn ("Dr.Kahn")—the Chair of the Department at the time Plaintiff was hired—who made the final decision to hire Plaintiff.

Defendant Dr. Anthony Angelo was born in the United States and considers himself to be a Roman Catholic Caucasian. Dr. Angelo was at all relevant times the Senior Vice President of Medical Affairs at the Medical Center. Dr. Sokol reported directly to Dr. Angelo.

During his tenure at COPC, Plaintiff was a salaried employee of the Medical Center and therefore a credentialed member of the medical staff.[1] Pursuant to Section 2805–k of the New York Public Health Law, before granting or renewing medical staff privileges, a hospital is required to request, and the physician is required to provide, certain information. That information includes: the name of any other hospital or facility at which the physician has or had privileges or with which the physician was otherwise associated; the reason for any discontinuation of such association, if applicable; any misconduct proceedings or malpractice actions pending against the physician; and a verification by the physician that the information provided is true and accurate. N.Y. Pub. Heath L. § 2805–k(1)(a)–(c). The hospital must then request from every hospital identified by the physician, information regarding professional misconduct proceedings or malpractice actions, judgments, or settlements or any other incidents of possible professional misconduct. *Id.* At the Medical Center, physicians applying for medical staff privileges must fill out a Medical Staff Re–Appointment Application. Physicians must be re-credentialed every two years.

On or about October 5, 1999, in accordance with the Medical Center's procedures, Dr. Ahmad submitted to the Medical Staff Office an application for renewal of his medical staff privileges ("1999 Application"). Defendants claim that Plaintiff intentionally misrepresented information on his 1999 Application and these misrepresentations led to Plaintiff's dismissal in February 2000.

According to Defendants, Dr. Ahmad's responses to two questions on the 1999

---

1. Salaried physicians are both employees of the Medical Center and members of the medical staff. However, doctors may have medical staff privileges and be members of the medical staff without being employees of the Medical Center. In fact, many members of the medical staff are not employed by the Medical Center. As a member of the medical staff, a doctor is credentialed by an institution to practice medicine at that particular institution. A physician who is a member of a hospital's medical staff may treat and admit patients but is not necessarily a salaried employee of that hospital. However, in order to be a salaried employee, a doctor must also be a member of the medical staff and, therefore, credentialed by the institution in which he or she practices. In sum, one can be a member of the medical staff without being an employee, but to be an employee, one must be a credentialed member of the medical staff. Given that Dr. Ahmad was a salaried employee of the Medical Center, he was also required to obtain medical staff privileges there.

Application were the basis for his subsequent termination. Plaintiff's responses to the questions are uncontroverted.

*The first page of the application states: "List all other hospitals at which you are a member of the Medical Staff or where you were a member within the past ten (10) years."*

Plaintiff listed only Mercy Medical Center, Island Medical Center, and Franklin Hospital in response to this question.

*On the second page of the application, Question No. 7 asks: "Has your association, employment practice or privileges in any hospital or institution ever been relinquished, suspended, diminished, revoked, or modified in any other manner?"*

Plaintiff originally answered "No" to this question but scratched out his "No" answer and responded "Yes."

*The top of the second page of the application states: "If the answers to any of the following questions is 'Yes', please provide us with details on separate sheet(s) of paper."*

Despite answering "Yes" to Question No. 7, Plaintiff did not provide further explanation, as required by the application.

Pursuant to § 2805–k(2), the Medical Staff Office sent letters to the three hospitals Dr. Ahmad had listed on page one of the 1999 Application—Mercy, Island, and Franklin—seeking confirmation of the status of Dr. Ahmed's privileges at those hospitals. All three hospitals provided the Medical Center with information regarding Plaintiff's privileges.

In December 1999, the Medical Staff Office noted that Dr. Ahmad had answered "Yes" to Question 7 but failed to provide the requisite explanation for his answer. On December 7, 1999, Dr. Gerald Mondschein, the Chairman of the Medical Staff Credentials Committee, sent a letter to Dr. Ahmad asking him to explain his response to Question 7. On December 16, 1999, Dr. Ahmad sent a letter to Dr. Mondschein which stated that, as a result of a negative outcome relating to his treatment of a patient at Southside Hospital ("Southside") in October 1998, Plaintiff had been asked to leave the hospital. Dr. Ahmad also stated in his December 16 letter that the Southside incident was reported to and investigated by the New York State Office of Professional Medical Conduct ("OPMC") and that "no action" had been taken against Plaintiff.[2] Dr. Ahmad failed to list Southside on the first page of the 1999 Application when asked at which hospitals he had been a member of the medical staff during the past ten (10) years. Plaintiff claims that at the time he believed he was only required to list those hospitals at which he was then active.

Southside had in fact terminated Dr. Ahmad's employment and medical staff privileges effective December 8, 1998, following an October 1998 incident with a patient of Dr. Ahmad's. Shortly thereafter, Southside reported this occurrence to OPMC. In connection with OPMC's investigation of the incident at Southside, Plaintiff received a document from OPMC stating, in boldface: "Licensees should never assume an OPMC investigation is closed because they haven't had recent contact with OPMC." (Defs.' Ex. F.)

On or about February 7, 2000, Dr. Ahmad received a letter from OPMC stating it had completed its investigation into the

**2.** OPMC investigates all complaints brought against physicians by patients, family members, friends, heath care professionals and other entities. OPMC is authorized to impose disciplinary action, from censure or reprimand to suspension or revocation of a physician's medical license.

incident at Southside and had determined that Plaintiff's involvement merited an Administrative Warning. The February 7 letter instructed Dr. Ahmad to appear before OPMC on March 16, 2000 to receive his Administrative Warning in person.[3] This notification from OPMC regarding the results of the Southside investigation was received by Plaintiff approximately four (4) months after Plaintiff filled out the 1999 Application, and only a few weeks before he was fired from NHCC. Plaintiff completed the 1999 Application less than a year after Southside had rescinded his medical privileges. Moreover, although Plaintiff had stated in his December 16, 1999 letter to Dr. Mondschein that no action had been taken against him regarding the Southside incident, OPMC's investigation was not closed until February 7, 2000. Plaintiff claims he was unaware that the investigation was ongoing.

Defendants contend that, after reviewing Plaintiff's 1999 Application, Drs. Angelo and Sokol determined Dr. Ahmad's misrepresentations were material and purposeful. Plaintiff completed the 1999 Application less than one year after Southside terminated his employment, therefore Defendants allegedly felt it was unlikely that Plaintiff simply forgot to report the incident. Plaintiff claims he did not see the section of the 1999 Application requiring him to provide additional information if he checked "Yes" for Question 7. Defendants allegedly found Plaintiff's excuses unpersuasive, particularly given the fact that Plaintiff also failed to list Southside on page one of the 1999 Application as a hospital at which he had enjoyed medical privileges. This seemed to indicate to Defendants that Dr. Ahmad was purposefully attempting to conceal the incident at Southside. Further, Defendants allegedly felt that the information Plaintiff provided in his December 16 letter to Dr. Mondschein was insufficient, given that Plaintiff indicated to Dr. Mondschein that the Southside investigation was closed when in fact OPMC had not yet completed its inquiry. Plaintiff was subsequently fired on February 16, 2000.

NHCC thereafter reported Plaintiff's omissions in his 1999 Application to OPMC, which, in a letter dated February 21, 2001, found that Plaintiff's conduct merited the issuance of an Administrative Warning. On March 8, 2001, Plaintiff was called before OPMC and given an Administrative Warning for omissions on his 1999 Application for medical privileges at NHCC.

During the course of discovery relating to this action, Defendants learned of other omissions contained in Plaintiff's 1999 Application. It came to light that Plaintiff had, some time after October 1994, been employed at Wyckoff Heights Medical Center ("Wyckoff") and had been sued for malpractice in connection with an incident there. That action was commenced in February 1999, eight months before Plaintiff completed the 1999 Application, and discontinued on or about July 10, 2000. Plaintiff failed to report this information when he filled out his 1999 Application. Although, as discussed further *infra,* these facts may not be used to bolster Defendants' Motion for Summary Judgment given that they were discovered after the termination at issue in this action, they are documented below in the interest of completeness.

---

**3.** Thereafter, OPMC sent a letter to Plaintiff, dated February 28, 2000, advising him that his Administrative Warning relating to the Southside incident had been canceled. It is not clear from the record or the parties' motion papers why the Administrative Warning was never given to Plaintiff.

On page two of the 1999 Application, Question No. 8 asks: "Have you voluntarily relinquished privileges in any hospital or heath related facility?"

Plaintiff answered "No" to this question. Plaintiff no longer enjoyed medical staff privileges at Wyckoff, because he had decided not to fill out the reappointment application. Plaintiff claims he did not equate a failure to reapply for privileges at Wyckoff with "relinquishing privileges."

Question No. 10 asks: "Are there any professional misconduct proceedings pending against you in this state or another?"

Plaintiff answered "No" to this question even though the OPMC investigation into the incident at Southside was still pending. Plaintiff claims he thought the investigation had been closed.

Question No. 11 asks: "Are there any malpractice actions pending against you in this state or another?"

Plaintiff answered "No" to this question even though a medical malpractice action was pending against him in connection with services he provided at Wyckoff.

## DISCUSSION

### A. Standard for Summary Judgment

A motion for summary judgment may not be granted unless the court determines that there is "no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The court must resolve all ambiguities and draw all inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Castle Rock Entm't,* *Inc. v. Carol Publ'g Group*, 150 F.3d 132, 137 (2d Cir.1998). If there is any evidence in the record from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper. *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir.1994).

The party seeking summary judgment bears the burden of demonstrating that no genuine factual dispute exists. *Chambers*, 43 F.3d at 36; *Adams v. Department of Juvenile Justice*, 143 F.3d 61, 65 (2d Cir. 1998). However, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348 (citation omitted). The non-moving party must show that a disputed material fact exists in light of the substantive law by offering "concrete evidence from which a reasonable juror could return a verdict in [its] favor." *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988) (quoting *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505).

### B. Title VII Claim

Plaintiff alleges, *inter alia*, that his termination from NHCC in February 2000 was discriminatory based on his race, national origin, and religion in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* Title VII provides, in pertinent part:

It shall be an unlawful employment practice for an employer -

(1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, be-

cause of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a).

■ The initial burden of proving a prima facie case of discriminatory discharge rests with the plaintiff. *McDonnell Douglas v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Collins v. New York City Transit Auth.* 305 F.3d 113, 118 (2d Cir.2002). To establish a prima facie case for discriminatory discharge based on race, national origin, or religion in violation of Title VII, a plaintiff must show: (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment decision; and (4) circumstances surrounding the adverse employment action gave rise to an inference of discrimination. *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089; *Collins,* 305 F.3d at 118.

If the plaintiff establishes a prima facie case, the burden shifts to the defendant, who then must "articulate some legitimate, non-discriminatory reason" for its employment decision. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Burdine,* 450 U.S. at 253–54, 101 S.Ct. 1089. If the defendant "articulates a non-discriminatory reason, the *McDonnell Douglas* burden-shifting framework drops out of the picture." *Adeniji v. Admin. for Children Services, NYC,* 43 F.Supp.2d 407, 420 (S.D.N.Y.1999) (citations omitted). Therefore, once the defendant asserts a legitimate reason for the termination, the burden then lies with the plaintiff to show that the defendant's reason was in fact pretextual, and that discrimination was more likely than not the true reason for the adverse employment action. *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817; *James v. New York Racing Ass'n,* 233 F.3d 149, 153–54 (2d Cir.2000).

This Court's analysis is simplified by the fact that Defendants assume, although only for the purposes of this Motion for Summary Judgment, that Plaintiff is able to establish the first three elements of a prima facie case of discriminatory discharge. Therefore, the only element this Court need discuss is the fourth: whether the circumstances surrounding Plaintiff's termination gave rise to an inference of discrimination.

### 1. Plaintiff's prima facie claim pursuant to Title VII

The evidence on which Plaintiff relies in support of his discrimination claim consists of: (1) various statements allegedly made by Dr. Sokol that Plaintiff felt were discriminatory in nature; (2) Dr. Sokol's initial objection when Dr. Ahmad requested days off during a Muslim holiday; and (3) Dr. Sokol's hiring and firing practices, which Plaintiff claims demonstrate that Dr. Sokol harbors animus toward individuals of Middle Eastern descent. As discussed in more detail *infra,* Plaintiff's proof of discrimination is tenuous at best and does not establish an inference of discrimination as required by Title VII.

### a. Dr. Sokol's allegedly discriminatory statements

■ Plaintiff cites to statements and jokes allegedly made by Dr. Sokol during unspecified times throughout Plaintiff's employment at NHCC from 1994 to February 2000. These statements include the following:

Plaintiff alleges he was engaged in a conversation with Dr. Sokol about a recent change in policy Plaintiff did not view favorably.

Dr. Sokol allegedly stated, "Dr. Kahn and his kingdom would soon be gone" and "there are too many people like Dr.

Kahn in the Department of Medicine."
(Ahmad Dep. at 31–33.)

Dr. Sokol allegedly told a dirty joke involving a woman and two midgets to Plaintiff and another physician. Plaintiff interpreted this joke to be derogatory toward him based on his Pakistani origin. Although the joke allegedly told by Dr. Sokol had nothing to do with people of Pakistani origin or the Muslim religion, Plaintiff claims that since his height is only five feet four inches, he found a joke about a midget to be offensive. Although the other doctor present was also of modest stature, Dr. Ahmad though the joke was directed at him, because Dr. Sokol looked "mostly" at Plaintiff when he was allegedly telling the joke. (Ahmad Dep. at 43–46.)

Plaintiff claims that Dr. Sokol told another joke regarding an incident reported on the news where Yasir Arafat was meeting with an Israeli leader, and pork was served at the dinner, although neither leader ate pork for religious reasons.

Plaintiff claims Dr. Sokol stated that there are "too many foreign graduates in the Department of Medicine." (Ahmad Dep. at 38.)

██ It seems unlikely that a jury could find these comments, even taken together, to indicate a racial or religious animus on the part of Defendants. Verbal comments may constitute evidence of discrimination only when such comments are: (1) related to race, religion, and/or national origin; (2) "proximate in time to the adverse employment decision"; (3) "made by an individual with authority over the employment decision at issue"; and (4) "related to the employment decision at issue." *Ruane v. Continental Cas. Co.*, 1998 WL 292103, at *9 (S.D.N.Y. June 3, 1998). In any event, "not all comments that reflect a discriminatory attitude will support an inference

that an illegitimate criterion was a motivating factor in an employment decision.... In particular, stray remarks in the workplace, ... and statements by decision makers unrelated to the decisional process are not by themselves sufficient to satisfy plaintiff's burden of proving pretext." *Burrell v. Bentsen*, 1993 WL 535076, at *8 (S.D.N.Y. Dec. 21, 1993), *aff'd*, 50 F.3d 3 (2d Cir.1995) (citation and internal quotation marks omitted) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 278, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring)); *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir.2001) ("[T]he stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination.").

The alleged comments cited by Plaintiff on their own cannot support his prima facie claim under Title VII. The midget joke, for one, did not even mention race, religion or nation origin, and it is unclear how, if at all, it related to Dr. Ahmad's Pakistani origin. Likewise, Dr. Sokol claims that his relaying of the news report to Dr. Ahmad regarding Yasir Arafat was not meant to be a joke. Rather, Dr. Sokol, as a person of the Jewish faith, thought Dr. Ahmad, as a person of the Muslim faith, would be equally offended by this apparent insensitivity to a common dietary restriction.

The comments about Dr. Kahn, which are likely too vague to support a claim of race discrimination, have no connection to the decision to terminate Plaintiff. *See Burrell*, 1993 WL 535076, at *8. Defendants claim that these comments were in reference to the dictatorial style of Dr. Kahn, and had nothing to do with his race or national origin, which is Indian. Furthermore, Dr. Kahn was terminated almost a year before Plaintiff's firing, and

Dr. Sokol had nothing to do with Dr. Kahn's dismissal.

The comment most likely to indicate racial animus is Dr. Sokol's alleged statement regarding foreign graduate students. Defendants claim this alleged comment was not critical of foreign graduate students from any particular country and did not single out people of Pakistani national origin or the Muslim faith. Furthermore, Defendants point out that Plaintiff was not a graduate student but an employed physician. Although this comment, if true, is certainly troubling, this Court is not convinced it meets fourth requirement of a prima facie Title VII action: that the circumstances surrounding Plaintiff's discharge gave rise to an inference of discrimination. There is no context for when this remark was supposedly made; it could have been made years before Plaintiff's termination. This lack of specificity in time and place of many of Dr. Sokol's alleged comments cuts against Plaintiff's claims of a discriminatory atmosphere. Therefore, the alleged comments alone do not seem indicate an inference of discrimination.

### b. Plaintiff's request for days off during a Muslim holiday

■ Plaintiff asserts that Dr. Sokol refused on one occasion to give him requested days off during a Muslim holiday. Defendants contend that Dr. Sokol merely objected to three Muslim physicians in COPC taking off three days in a row at the same time. In fact, according to Plaintiff's own deposition, Dr. Sokol permitted all three physicians to observe portions of the holiday. (Ahmad Dep. at 54.) The alleged reluctance of Dr. Sokol to give Plaintiff three days off for a Muslim holiday does not on its face indicate animus against Muslims, particularly given that Dr. Sokol had legitimate scheduling concerns. Fur-

thermore, Dr. Sokol's willingness to permit the physicians at least part of the holiday off cuts against Plaintiff's claim of discriminatory action.

### c. Plaintiff alleges Dr. Sokol exhibited discriminatory hiring and firing practices

■ A pattern or practice theory requires a plaintiff to "establish by a preponderance of the evidence that . . . discrimination was the company's standard operating procedure—the regular rather than the unusual practice." *Int'l Bd. of Teamsters v. United States*, 431 U.S. 324, 336, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Courts must accept that plaintiffs are often forced to rely on circumstantial evidence in discriminatory discharge actions, since employers who discriminate are unlikely to leave a "smoking gun." *Rosen v. Thornburgh*, 928 F.2d, 528, 533 (2d Cir.1991); *see also Chambers*, 43 F.3d at 37. It does not follow, however, that a plaintiff's unsupported personal beliefs can provide the sole evidence of a pattern or practice of discrimination by an employer.

■ Plaintiff relies on purely anecdotal evidence in furtherance of his claim that Defendants engaged in a pattern or practice of discrimination against Pakistani or Muslim physicians. Plaintiff identifies at least four other physicians he claims were fired under "dubious circumstances": Dr. Kahn (Indian), Dr. Mier (Indian), Dr. Gujuruaty (Indian) and Dr. Reddy (Indian). (Pl.'s Aff. at ¶ 45). Plaintiff does not indicate the religious affiliations of these doctors. Plaintiff further claims, on information and belief, that these physicians were replaced by Caucasian Americans. However, beyond these unsubstantiated assertions, Plaintiff provides no evidence as to Defendants' pattern or practice of hiring and firing. Plaintiff was questioned in detail during his deposition about the physi-

cians allegedly fired as part of a pattern or practice of discrimination, and he could provide little more than speculation as to the reasons behind the termination of these physicians. Plaintiff was not even sure if all of these doctors had in fact been fired or if one or all of them left voluntarily. Plaintiff's vague claims fail to establish a specific pattern or practice by Defendants giving rise to an inference of discrimination surrounding Plaintiff's discharge.

#### d. Same actor theory

Defendants contend that Dr. Ahmad cannot establish the fourth element of a discriminatory discharge claim because he was hired and terminated by the "same actor." The Second Circuit has held that "when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to [him] an invidious motivation that would be inconsistent with the decision to hire." *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir.1997), *cert. denied*, 525 U.S. 936, 119 S.Ct. 349, 142 L.Ed.2d 288 (1998). Generally, the "same actor" theory is purported to imply that a manager who hired a member of a protected class is not likely to suddenly develop an aversion to members of that class. *Id.; Carlton v. Mystic Transp., Inc.* 202 F.3d 129, 137–38 (2d Cir.2000). In the instant case, there is a genuine issue of fact as to whether Dr. Sokol or Dr. Kahn hired Plaintiff. However, it does not follow that this fact is necessarily material, and therefore fatal to Defendants' motion. If Defendants could prove Dr. Sokol hired Plaintiff, it would certainly bolster their argument that Dr. Sokol harbors no animus against persons of Pakistani decent or the Muslim faith.

Whether or not Dr. Sokol hired Plaintiff, however, is not determinative as to Plaintiff's prima facie case under Title VII. Further, as discussed in more detail below, even if Plaintiff could prove a prima facie Title VII case, Dr. Ahmad fails to demonstrate that Defendants' justifications for the termination were pretextual.

#### 2. After-acquired evidence

 Certain misrepresentations made by Plaintiff in his 1999 Application were only discovered by Defendants subsequent to the commencement of this action. These facts cannot be used by Defendants to bolster their Motion for Summary Judgment. "After-acquired evidence is evidence of employee misconduct, such as criminal behavior, employer rule infractions, malpractice and the like, committed during the course of employment, of which the employer became aware only after the employee's termination." *Ahing v. Lehman Bros.*, 2000 WL 460443, at *11 (S.D.N.Y. Apr. 20, 2000) (citing *Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 147 n. 17 (2d Cir.1999)) (the after-acquired evidence doctrine holds that "an employer cannot escape liability [for discrimination] based on evidence of the plaintiff's misconduct that would have justified her termination in any event, when the employer discovered such evidence after it had fired the plaintiff for discriminatory reasons"); *see also McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995). Additional omissions contained in the 1999 Application and discovered during Dr. Ahmad's deposition may not be used to justify Plaintiff's termination, since at the time of termination Defendants were not aware of these misrepresentations.[4]

---

**4.** Defendants claim, correctly, that this after-acquired evidence may serve to bolster the argument that Plaintiff intentionally misrepre-

sented material facts in his 1999 Application. However, it is not the role of this Court in reviewing Defendants' Motion for Summary

### 3. Plaintiff must show Defendants' justification was pretextual

■ Even assuming, *arguendo*, Plaintiff is able to establish a prima facie case for discriminatory discharge, his Title VII claim would nevertheless fail, given that he is unable to show that the non-discriminatory reason articulated by Defendants for the termination was pretextual. *Norton v. Sam's Club*, 145 F.3d 114, 119 (2d Cir.1998)("[Plaintiff's] very weak prima facie case, combined with an at best highly dubious showing of pretext, that in itself does not implicate discrimination, is simply not enough...").

Defendants assert that the decision by Drs. Sokol and Angelo to terminate Plaintiff was based solely on the material misrepresentations Dr. Ahmad made on his 1999 Application for medical privileges. This is a legitimate, non-discriminatory reason for termination, therefore the burden shifts to Plaintiff to show this proffered justification is no more than a pretext for discriminatory action. *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817; *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089. Plaintiff must come forward with "evidence from which a fact-finder could reasonably conclude that the [employer's] reason was pretextual and that the real reason was discrimination." *Brennan v. Metropolitan Opera Ass'n*, 192 F.3d 310, 317 (2d Cir.1999).

This Court's role in reviewing the instant Motion for Summary Judgment is not to weigh the evidence or determine the truth of a matter but to ascertain whether there is a genuine issue for trial.

*Anderson*, 477 U.S. at 255, 106 S.Ct. 2505 ("Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for directed verdict."). Regardless of the value this Court places on Dr. Ahmad's explanation for his omissions, Defendants' justification for Plaintiff's termination is clearly legitimate. Dr. Ahmad's failure to list Southside hospital on page one of the 1999 Application, and his initial failure to submit an explanation for his answer to Question 7, are sufficient reasons to warrant his termination. Furthermore, this type of conduct is clearly considered serious in the medical community, given that OPMC issued an Administrative Warning to Dr. Ahmad after conducting an investigation into his omissions on the 1999 Application.

Plaintiff has failed to produce any evidence that the reason for termination proffered by Defendants is false or that discrimination was the true reason for Dr. Ahmad's termination. "[A]n employment discrimination plaintiff faced with a properly supported summary judgment motion must 'do more than simply show that there is some metaphysical doubt as to the material facts.'" *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir.2001) (quoting *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348). Plaintiff produces no evidence that the representations in his 1999 Application did not warrant his subsequent dismissal.[5]

Plaintiff has failed to meet his burden of proving Defendants' justification for dis-

---

Judgment to weigh evidence or determine whether Plaintiff's claims are credible. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. Those are tasks for a jury. Therefore, this Court shall not consider the after-acquired evidence in deciding the instant motion.

5. In his Local Rule 56.1 statement, Plaintiff highlights the fact he was reappointed to the

staff of NHCC in June 2001 and subsequently laid off in January 2002. Defendants contend that this second firing was in connection with restructuring taking place in COPC and coincided with the lay-offs of a number of other doctors. Plaintiff points to his rehiring as proof that the February 2000 dismissal, at issue in this action, was not warranted. Plaintiff claims that if his transgression was

missal is no more than a pretext. Viewing all evidence in the light most favorable to Plaintiff, this Court is convinced that no rational jury could find that Dr. Ahmad's termination was motivated by race, national origin, or religion. Therefore, Defendants' motion is granted as to Dr. Ahmed's Title VII claim.

## C. State Law Claims

Plaintiff further alleges that his termination from NHCC violated the NYSHRL, N.Y. Exec. L. § 296. Courts have consistently held that the dismissal of a plaintiff's federal claims merits dismissal of his pendent state law claims. *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988); *Maric v. St. Agnes Hosp. Corp.*, 65 F.3d 310, 314 (2d Cir.1995)(citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)); *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir.1998). Having concluded that Defendants are entitled to summary judgment as to Plaintiff's underlying federal claims, this Court declines to exercise pendent jurisdiction over the corresponding State law claims. Plaintiff's State law claims are hereby dismissed without prejudice.

## CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment must be, and the same hereby is, GRANTED in full, and Defendants are awarded their costs. The Clerk of the Court is advised that this Order closes the case.

SO ORDERED.

truly so egregious, he would not have been rehired in the first place. The fact that Plaintiff was rehired by NHCC does not mitigate the severity of Dr. Ahmad's initial deception. Likewise, subsequent employment actions by Defendants have no bearing on whether the initial dismissal of Plaintiff was warranted. This action is based neither on Dr. Ahmad's January 2002 firing nor on a claim of retaliatory action by Defendants. (Retaliation claims, pursuant to Title VII and N.Y. Exec. L. §§ 296 and 297, were originally part of Plaintiff's Amended Complaint, but the parties stipulated to the dismissal of those claims, and this Court so ordered the same, on June 1, 2001.) Furthermore, Defendants' willingness to rehire Dr. Ahmad cuts against Plaintiff's claim of discriminatory discharge in the first instance. Defendants' motion papers do not address the issue of Dr. Ahmad's rehiring, and Plaintiff only touches upon it briefly. Therefore, based on the record before this Court, there is no material issue of fact with respect to Dr. Ahmad's subsequent rehiring by NHCC.