Juan SANTOS, Plaintiff,

v.

COSTCO WHOLESALE, INC., Defendant.

No. 02 CIV. 2538(CM).

United States District Court, S.D. New York.

July 9, 2003.

Daniel J. Kaiser, Kaiser Saurborn & Mair, P.C., New York City, for Juan M. Santos, plaintiff.

Lorie Almon, Seyfarth Shaw, New York City, for Costco Wholesale, Inc., defendant.

### MEMORANDUM DECISION AND ORDER

MCMAHON, District Judge.

Plaintiff Juan Santos brings this suit against defendant Costco Wholesale, Inc. ("Costco"), alleging that defendant violated 42 U.S.C. § 1981 ("Section 1981"), New York State Executive Law § 296; and New York City Administrative Code § 8–502(a) by demoting him due to his "national origin" and then firing him in retaliation for filing a lawsuit challenging his demotion as discriminatory. Costco now moves for summary judgment on all claims.

For the following reasons, defendant's motion is granted in part and denied in part.

## FACTS

The following facts are either undisputed or interpreted most favorably to plaintiff, the nonmoving party.

Plaintiff Juan Santos began working for defendant Costco on October 2, 1989. [Defendant's 56.1 Statement ¶ 2]. Santos originally worked as a Front End Supervisor in its Miami, Florida warehouse. *Id.* at ¶ 13. Costco promoted Santos several times, culminating in Santos's 1994 promotion to the position of Warehouse Manager in its Nanuet, New York warehouse. *Id.*

In February of 1996, while working at the Nanuet warehouse, Santos received a formal warning for not meeting Costco's company-wide standards for allowable "inventory shrink." *Id.* at ¶¶ 14–15. "Inventory shrink" refers to product that is received in a warehouse; is not sold, destroyed, or otherwise accounted for; and is not physically in the warehouse when the inventory is counted. *Id.* at ¶ 14. In or about 1997, Costco reassigned Santos to a lower volume warehouse in Wharton, New Jersey due to the poor "inventory shrink" results at the Nanuet warehouse. *Id.* at ¶ 15.

Prior to 1997, Yoram Rubanenko worked for Costco as a Warehouse Manager, the same level position that Santos filled at the time. *Id.* at ¶ 17. After some managers' meetings, Rubanenko and Santos went to dinner together with a small group of other warehouse managers. *Id.* At several of those dinners, Rubanenko made statements regarding Santos's national origin and ethnicity. Santos testified: "[W]e would be entering the restaurant and he would extend his hand or his arm to tell me 'No, no, no. You can't come in here, they don't allow Puerto Ricans in

here,' or 'They don't allow Hispanics in here,' and he would laugh about it." [Santos Deposition 202]. Rubanenko "thought it was a joke," but Santos "didn't think it was funny at all." *Id.* at 203.

In 2000, Costco transferred Santos to its New Rochelle warehouse, which Santos viewed as a compliment because the New Rochelle warehouse posed a number of managerial challenges. [Santos Deposition 111; Plaintiff's 56.1 Statement ¶ 2]. At that time, Rubanenko was Regional Vice President for Northeast District No. 3, a position Costco had promoted him to in 1997. [Rubanenko Deposition 6–7]. In or about April of 2001, Rubanenko replaced Santos's direct supervisor, Russ Miller, as Regional Vice President for Northeast District No. 1. [Defendant's 56.1 Statement ¶ 24]. When Rubanenko became Santos's supervisor, he said to Santos: "I guess I can't make those jokes with you anymore." [Amended Complaint 13].

From April 24 until April 27, 2001, Costco's internal audit department conducted an audit of the New Rochelle warehouse. The audit found that the New Rochelle warehouse was not in compliance with a number of Costco's policies and procedures and had not corrected a number of "previous concerns" that an earlier audit had identified. [Defendant's 56.1 Statement ¶ 30]. Santos acknowledged that the audit's description of the New Rochelle warehouse was accurate. *Id.*

In accordance with usual procedures, Rubanenko received a copy of the April audit. In reaction to the audit, Rubanenko wrote to Santos:

Juan, a completely unacceptable audit. We're missing basics across the board.
-cash controls
-shrink controls
-SAFETY!!!
-hot sheet issues

-previous concerns

Let's get this corrected quickly—call me to discuss.

[Defendant's 56.1 Statement ¶ 31]. Jeffrey Long, Costco's Senior Vice President for the Northeast Region (to whom Rubanko reported), also received a copy of the April audit. He wrote a memo to Santos stating: "Your audit of April 24th was extremely poor. 4 out of 5 hot sheet issues were not in compliance. 14 previous concerns from the last audit were not corrected. It is imperative that you and your staff correct these issues. Please send me your plan." *Id.* at 32.

In May of 2001, a report revealed that the New Rochelle warehouse experienced unusually high losses resulting from damage that occurred to merchandise after the warehouse received it—an occurrence Costco terms "Damage and Destroy," or "D & D." [Defendant's 56.1 Statement ¶ 34–35]. Rubanenko reviewed the report and wrote to Santos: "Juan[,] Completely unacceptable. How can this occur? Who is watching/being held accountable[?] Please explain and how it will be prevented. Why am I the last to know? ... P.S. District as a whole was impacted by this." [Defendant's 56.1 Statement ¶ 35].

Another May 2001 D & D report indicated that the New Rochelle warehouse was losing approximately twice as much in D & D as it had during the same fiscal period in 2000. The New Rochelle warehouse's results were similarly poor in a July 2001 report. As a result, Rubanenko wrote the following to Santos and three other Warehouse Managers: "Your locations have more D & D than each of the other 2 Districts. Please get your arms around this and fix." [Defendant's 56.1 Statement ¶ 37]. Santos acknowledged his warehouse's sub-par D & D performance in an email to Long, and he told Long: "[Y]ou have my personal commitment on the D &

D focus." [Defendant's 56.1 Statement ¶ 38].

The New Rochelle Warehouse also had a problem with "shrink"—merchandise received by the warehouse but subsequently lost or stolen. [Defendant's 56.1 Statement ¶ 44]. Santos devised a "shrink reduction plan" in which he identified goals for the warehouse. During the rest of his tenure at New Rochelle, however, the warehouse failed to meet most of the goals Santos set. *Id.*

In late 2001, Santos discussed with Long the possibility of reassigning Santos to a new warehouse in Puerto Rico. [Defendant's 56.1 Statement ¶ 50]. This was an option that Santos had discussed with his supervisors at Costco as early as the beginning of 2001. *Id.* at ¶ 47. Santos did not consider these discussions discriminatory. *Id.* at ¶ 49. Indeed, On December 17, 2001, he sent a memo to Long formally requesting a transfer to open a new warehouse in Puerto Rico. *Id.* at ¶ 50.

In January of 2002, an inventory review of the New Rochelle warehouse revealed that it had a very large amount of "shrink." Santos acknowledged the "shrink," writing a letter to Costco's Chief Operating Officer, Joseph Portera, in which he stated: "I totally understand the disappointment with my current shrink results ... I am not sure as to my future given these results." [Defendant's 56.1 Statement ¶¶ 53–54].

In early February 2002, Long told Santos that, as a result of his poor shrink results, his request to transfer to Puerto Rico was "off the table." *Id.* at ¶ 57. Long later told Santos that he was being reassigned to an Assistant Warehouse Manager position and asked Santos where he would like to be reassigned to. Santos told him that he would like to go to south Florida. *Id.* Long memorialized the conversations in a memo entitled "Relocation

to North Miami Beach # 182." *Id.* at 58. The memo states:

> As discussed on February 5th in our Sterling offices, and again in our telephone conversation on February 7th, you are being reassigned to the position of assistant manager at the North Miami Beach location.
>
> This reassignment is due to your inventory results at New Rochelle coming in at 0.695, and as discussed your continuing issues in managing the New Rochelle warehouse and our lack of confidence at the present time for you to continue in the position of warehouse manager.

*Id.*

On March 5, 2002, Santos's attorney sent a letter to John Matthews, a Costco Senior Vice President, alleging that Costco had discriminated against Santos due to his "national origin." [Kaiser Decl., Ex. A]. The letter alleged that the downturn in Santos's career occurred due to Rubanenko's discriminatory animus toward him. It further alleged that Long's offer to Santos to work in Puerto Rico and Miami were due to Costco's belief that "Mr. Santos is more suited to working in largely Hispanic communities." *Id.*

On March 10, 2002, Santos's replacement as manager, Dennis Dingivan, provided a memorandum to Long outlining the "issues that [he] encountered" at the New Rochelle warehouse. [Almon Decl., Ex. G, Plaintiff's Ex. 5]. In addition, information arose (after Santos left to work in Florida) regarding health and sanitation issues at the New Rochelle warehouse. As a result, Portera asked Dingivan to keep him informed. [Defendant's 56.1 Statement ¶ 65]. Dingivan provided Portera with an addendum to his March 10, 2002 memorandum on April 30, 2002. *Id.* at ¶ 66.

Costco fired Santos on June 18, 2002. [Plaintiff's 56.1 Statement ¶ 20]. Plaintiff argues that Costco demoted him from his position as warehouse manager because of animus toward him due to his Hispanic ethnicity. He further argues that Costco fired him in retaliation for complaining about the discrimination and filing a lawsuit. Costco contends that it demoted Santos because of his poor performance as the manager of the New Rochelle warehouse, and it fired him due to its discovery (after his demotion) of the full extent of his failings at New Rochelle and his concealment of those failures. [Defendant's 56.1 Statement ¶¶ 114–15].

## DISCUSSION

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When considering a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has made such a showing, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). Moreover, not every disputed factual issue is material

in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

■ Summary judgment is "ordinarily inappropriate" in the context of a workplace discrimination case because the allegations usually require an exploration into an employer's true motivation and intent for making a particular employment decision. *Patrick v. LeFevre*, 745 F.2d 153, 159 (2d Cir.1984). And "[e]mployers are rarely so cooperative as to include a notation in the personnel file that the [adverse employment action] is for a reason expressly forbidden by law." *Bickerstaff*, 196 F.3d at 448 (citation omitted).

■ Yet the "impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable." *McLee v. Chrysler Corp.*, 38 F.3d 67, 68 (2d Cir.1994). Plaintiff is not absolved of the responsibility of producing sufficient evidence from which a reasonable juror could return a verdict in his favor. *See Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202; *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir.1995) (finding that mere speculation or conjecture as to the true nature of the facts cannot overcome a motion for summary judgment); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all [discrimination] cases."); *Ricks v. Conde Nast Publications, Inc.*, 92 F.Supp.2d 338, 343–44 (S.D.N.Y.2000) (same).

#### A. *Plaintiff's New York City Law Claim*

■ The New York City Human Rights Law makes unlawful certain discriminatory practices and provides a cause of action for those aggrieved by such practices. *See* New York City Administrative Code § 8–502(a). "However, both New York State law and the New York City Administrative Code limit the applicability of the City Human Rights Law to acts occurring within the boundaries of New York City." *Duffy v. Drake Beam Morin*, 1998 WL 252063, at *11 (S.D.N.Y. May 19, 1998).

Santos does not allege that Costco discriminated against him in New York City. It is undisputed that, at all relevant times, Santos worked at Costco warehouses in Nanuet, New York; Wharton, New Jersey; New Rochelle, New York; and North Miami Beach, Florida. In addition, there is no evidence that Santos's supervisors (such as Rubanenko or Long) worked in New York City. And even if there were evidence that Santos's supervisors made the decisions to demote and terminate him in New York City (and there is none), that fact, standing alone, would be "insufficient to establish a violation of the City Human Rights Law when the employee[ ] affected by that decision did not work in New York City." *Id.* Thus, defendant's motion for summary judgment on plaintiff's City Human Rights Law claim is granted.

#### B. *Plaintiff's Discrimination Claim* [1]

■ Costco briefly argues (in two sentences embedded in a footnote) that I should dismiss Santos's Section 1981 claim because that statute does not prohibit discrimination on the basis of national origin. Upon first glance, Costco's argument has some merit: Plaintiff alleges he suffered

---

1. The same standards apply for claims of discrimination and retaliation pursuant to New York State Executive Law 296 and Section 1981. As a result, insofar as I address plaintiff's Section 1981 claims, I also address his parallel state claims. *See, e.g., Woolley v. Broadview Networks, Inc.*, 2003 WL 554754, at *7 (S.D.N.Y. Feb. 26, 2003).

"national origin discrimination" throughout his complaint and motion papers, and Section 1981 does not prohibit discrimination on that basis. *See Anderson v. Conboy,* 156 F.3d 167, 170 (2d Cir.1998) (citing *Saint Francis College v. Al–Khazraji,* 481 U.S. 604, 609, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987)).

Putting aside plaintiff's denomination of defendant's alleged conduct toward him, however, it is clear that he also alleges (in substance) that Costco discriminated against him because he is Hispanic—which would constitute race-based discrimination prohibited by Section 1983. In his complaint, for example, plaintiff alleges: "Costco believes Mr. Santos, because of his ethnic identity, is more suited to working in largely Hispanic communities." [Complaint ¶ 21]. Similarly, plaintiff argues in his memorandum of law that "Mr. Rubanenko repeatedly made derogatory remarks to Mr. Santos about his Hispanic ethnicity." [Memorandum in Opposition 4]. Thus, I cannot grant summary judgment on the basis that national origin discrimination is not actionable under Section 1981. I therefore turn to the merits of plaintiff's discrimination claim.

■ Section 1981 provides that "[a]ll persons ... shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens." 42 U.S.C. § 1981. The right to make and enforce contracts encompasses employment discrimination. *See Johnson v. Railway Express Agency,* 421 U.S. 454, 459, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1976). And, as in the context of other employment discrimination statutes, the three-step burden shifting analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) applies when a plaintiff, as here, does not allege any direct evidence of discrimination. *See Patterson v. McLean Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132

(1989); *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir.2000).

■ Under the *McDonnell Douglas* burden-shifting framework, a plaintiff must first establish a *prima facie* case. If the plaintiff establishes a *prima facie* case, "a presumption of discrimination is created and the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason" for the allegedly discriminatory act(s). *Farias v. Instructional Sys., Inc.,* 259 F.3d 91, 98 (2d Cir.2001). If the defendant bears its burden of production, the presumption of discrimination "drops from the picture" and the plaintiff "must then come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." *Weinstock,* 224 F.3d at 42.

■ Costco first argues that plaintiff fails to establish a *prima facie* case. However, "[t]he burden on the plaintiff of presenting a prima facie case under *McDonnell Douglas* is 'minimal.'" *Roge v. NYP Holdings, Inc.,* 257 F.3d 164, 168 (2d Cir. 2001) (quoting *James v. New York Racing Ass'n,* 233 F.3d 149, 153 (2d Cir.2000)). As a result, I join an increasing number of courts in this Circuit and assume, without deciding, for purposes of this motion only, that plaintiffs have established a *prima facie* case. *See, e.g., Devlin v. Transp. Communications Intern. Union,* 2002 WL 413919, at *7 (S.D.N.Y. Mar. 14, 2002); *Lanahan v. Mut. Life Ins. Co. of New York,* 15 F.Supp.2d 381, 384 (S.D.N.Y. 1998); *Lapsley v. Columbia University–College of Physicians & Surgeons,* 999 F.Supp. 506, 514–15 (S.D.N.Y.1998); *see also Roge v. NYP Holdings, Inc.,* 257 F.3d 164, 168 (2d Cir.2001) (declining to reach question of whether plaintiff established a *prima facie* case because defendant met its burden of putting forth legitimate, non-

discriminatory reasons and plaintiff failed to proffer sufficient evidence of pretext).

■ The burden therefore shifts to Costco to articulate a legitimate, non-discriminatory reason for demoting Santos. The evidence that Costco offers regarding plaintiff's performance as manager of the New Rochelle warehouse more than satisfies defendant's burden. Costco alleges (and plaintiff admits), for example, that Santos's January 2002 inventory results were the worst of any of the fifty-eight Warehouse Managers under Long's supervision. [Defendants 56.1 Statement ¶ 53; Plaintiff's 56.1 Statement ¶ 53]. Costco also produces evidence that Santos's supervisors warned him about his performance.

Because Costco has satisfied its burden of production, "the governing standard is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred." *James*, 233 F.3d at 156. In other words, I must examine "the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir.2000) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)); *see also Lizardo v. Denny's, Inc.*, 270 F.3d 94, 103 (2d Cir.2001) ("The court must examine the entire record to determine if plaintiffs meet their ultimate burden of persuading the fact-finder of a central element of a 1981 claim: namely, that defendants intentionally discriminated against them on the basis of their race.").

■ The only evidence that plaintiff offers to prove that Costco demoted him

because of his race is Rubanenko's comments to him regarding his Hispanic ethnicity.[2] According to Santos, "[o]n repeated occasions while entering a restaurant [Rubanenko] would inquire loudly whether they let Puerto Ricans in the restaurant." [Santos Decl. ¶ 10]. Specifically, Santos alleges in his complaint that Rubanenko, on at least a dozen occasions, remarked: "You can not come in here. I don't think they let Puerto Ricans eat in here." [Complaint ¶ 12]. Santos also alleges that, upon first becoming Santos's supervisor, Rubanenko said: "I guess I can't make those jokes with you anymore." *Id.* at ¶ 13.

■ "Verbal comments may constitute evidence of discrimination only when such comments are: (1) related to race . . .; (2) 'proximate in time to the adverse employment decision'; (3) 'made by an individual with authority over the employment decision at issue'; and (4) 'related to the employment decision at issue.'" *Ahmad v. Nassau Health Care Corp.*, 234 F.Supp.2d 185, 193 (E.D.N.Y.2002) (quoting *Ruane v. Continental Cas. Co.*, 1998 WL 292103, at *9 (S.D.N.Y. June 3, 1998)); *see also Ross v. Communication Workers of America, Local 110*, 1995 WL 351462, at *13 (S.D.N.Y. June 9, 1995). Remarks that do not meet these criteria are deemed "stray" and insufficient, taken alone, to preclude summary judgment. *See Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 469 (2d Cir.2001) ("[S]tray remarks of a decision-maker, without more, cannot prove a claim a claim of employment discrimination.") (citing *Woroski v. Nashua Corp.*, 31 F.3d 105, 109–10 (2d Cir.1994)); *McLee v. Chrysler Corp.*, 109 F.3d 130, 137 (2d Cir. 1997) (holding that the biased statement of

---

**2.** Santos appears to no longer argue that the discussions regarding his transfer to Puerto Rico or North Miami Beach (both locales with sizable Hispanic populations) evidence Costco's discriminatory intent. [Defendant's 56.1 Statement ¶¶ 47, 57; Plaintiff's 56.1 Statement ¶¶ 47, 57].

a supervisor who was not consulted about a termination decision "provide no basis for imputing to [the decision maker] an invidious motivation for the termination").

Costco argues that Rubanenko's comments were "stray" because he was not a decision maker—i.e., he did not have authority over the decisions to demote or fire Santos. Yet Portera testified that Long and Rubanenko "participated" in his decisions to demote and terminate Santos. [Portera Deposition 60, 86–87]. *See Owens v. New York City Housing Authority*, 934 F.2d 405, 410 (2d Cir.1991) (holding that statements by supervisors with "substantial influence over [plaintiff's] employment" precluded summary judgment); *see also Rizzo v. Amerada Hess Corp.*, 2000 WL 1887533, at *5 (N.D.N.Y. Dec.29, 2000) (finding that remarks made by "decision maker or *one whose recommendation is sought by the decision maker*" may constitute evidence of discriminatory intent) (emphasis added).

Regardless of whether there is sufficient evidence for a jury to find that Rubanenko was a "decision maker," however, Rubanenko's remarks do not create a genuine issue of material fact for two reasons. First, they were not temporally proximate to either Santos's demotion or termination. Rubanenko made the remarks no later than 1997, four years prior to plaintiff's demotion, when Costco promoted Rubanenko and he was no longer a warehouse manager. *See, e.g., Tullo v. City of Mount Vernon*, 237 F.Supp.2d 493, 501–02 (S.D.N.Y.2002) (finding race-based comments made six years before adverse employment action did not constitute evidence of race discrimination). Second, there is no evidence that links the remarks and the decisions to demote and fire Santos. *See, e.g., Gorley v. Metro–North Commuter Railroad*, 2000 WL 1876909, at *6 (S.D.N.Y. Dec.22, 2000); *Eng v. Banco di Sicilia*, 2000 WL 134325, at *8 (S.D.N.Y. Feb. 4, 2000); *O'Connor v. Viacom Inc./Viacom Intern. Inc.*, 1996 WL 194299, at *5 (S.D.N.Y. April 23, 1996) ("[S]tray remarks in the workplace, by themselves, and without a demonstrated nexus to the complained of personnel action, will not defeat the employer's motion for summary judgment."), *aff'd*, 104 F.3d 356 (2d Cir.1996).

Of course, "when 'other indicia of discrimination are properly presented, the remarks can no longer be deemed "stray," and the jury has a right to conclude that they bear a more ominous significance.' " *Abdu–Brisson*, 239 F.3d at 469 (citing *Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 56 (2d Cir.1998)). But, as noted above, plaintiff offers nothing more than Rubanenko's remarks. As a result, defendant's motion for summary judgment on plaintiff's discrimination claim is granted.

C. *Plaintiff's Retaliation Claim*

"Retaliation claims are cognizable under § 1981." *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 105 (2d Cir.2001). "[T]he elements required to make out a claim of retaliatory discharge under 42 U.S.C. § 1981 are the same as those required to make out such a claim under Title VII," and the *McDonnell Douglas* burden-shifting scheme applies. *Taitt v. Chemical Bank*, 849 F.2d 775, 777 (2d Cir.1988).

To make establish a *prima facie* case of retaliation under Section 1981, plaintiff must show (1) he was engaged in protected activity; (2) Costco was aware of that activity; (3) he suffered an adverse employment action; and (4) there was a causal link between the protected activity and the adverse employment action. *See, e.g., Cruse v. G & J USA Pub.*, 96 F.Supp.2d 320, 327 (2d Cir.2000). Costco argues that Santos cannot show a causal link between his complaint of discrimination (the protected activity) and his termi-

nation (the adverse employment action). Temporal proximity is sufficient to establish causation, however, at least in the context of plaintiff's *prima facie* case. *See Lovejoy–Wilson v. NOCO Motor Fuel, Inc.,* 263 F.3d 208, 224 (2001); *Gorman–Bakos v. Cornell Cooperative Extension of Schenectady Cty.,* 252 F.3d 545, 554 (2d Cir.2001); *Das v. Our Lady of Mercy Med. Ctr.,* 2002 WL 826877, at *12 (S.D.N.Y. Apr. 30, 2002). The proximity between Santos's termination and his complaint of discrimination (approximately three months) is sufficient to establish a *prima facie* case.

 Costco articulates the following as legitimate, non-discriminatory reasons for plaintiff's termination: After Santos transferred to Florida, Costco found out that (1) Santos had failed to pay more than $50,000 in invoices, creating a false impression that the New Rochelle warehouse was meeting its expense budget [Defendant's 56.1 Statement ¶¶ 67–72]; (2) Santos had forced employees to take vacation time that they had not earned because the expense of vacation benefits is not charged to an individual warehouse's payroll budget, *id.* at ¶¶ 103–111; (3) Santos had authorized the sale of damaged merchandise to employees (a violation of Costco policy) in order to improve his D & D results, *id.* at ¶¶ 95–102; and (4) the New Rochelle warehouse was infested with rodents and Santos had concealed the problem, *id.* at ¶¶ 72–89.

 In response to Costco's articulated reasons for terminating him, Santos offers evidence that he contends establishes those reasons were pretextual and retaliation was Costco's real motive for firing him. In particular, plaintiff provides the deposition testimony of Frank Amador, an assistant manager at the New Rochelle warehouse both during and after Santos's tenure there. Amador testified that it was his understanding that Costco was intentionally trying to collect information about Santos after he (Santos) complained about discrimination. [Amador Deposition 43]. Amador also testified that Santos's replacement as manager, Dingavin, put pressure on him to provide a written statement regarding Santos's performance as manager. According to Amador, Dingivan suggested that Amador did not "want this to fall in [his] lap," and Amador took this as a threat to his job. *Id.* at 23.

Santos also provides evidence that his predecessor as manager of the New Rochelle warehouse, Dave Van Slyke, was not fired even though he engaged in conduct equally, if not more, egregious than the conduct Costco alleges motivated it to fire Santos. Specifically, plaintiff provides evidence that an investigation uncovered that Van Slyke downloaded pornography from the Internet and went gambling (at the race track) during work hours. [Portera Deposition 29–32; Long Deposition 158–63]. Upon discovering Van Slyke's conduct, Costco offered him two options: (1) voluntary resignation, or (2) demotion to the position of assistant manager. *Id.*

In sum, the evidence plaintiff offers suggests that (1) after Santos complained about the alleged discrimination, Costco started to collect negative information regarding his poor performance as manager of the New Rochelle warehouse; and (2) Costco did not terminate Santos's predecessor after it discovered that he had downloaded pornography and visited a race track during work. A reasonably jury could infer from this evidence that retaliation motivated Costco's termination of Santos. Summary judgment is denied on the retaliation claim.

D. *Punitive Damages*

 Punitive damages under Section 1981 are limited to cases in which the defendant has engaged in intentional dis-

crimination "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1); *see Kolstad v. American Dental Ass'n*, 527 U.S. 526, 529–30, 119 S.Ct. 2118, 144 L.Ed.2d 494 (2001). Defendant argues that it is entitled, as a matter of law, to the "affirmative defense recognized in *Kolstad*, which insulates an employer from punitive damages liability if it has made 'good faith efforts to enforce an antidiscrimination policy.' " *Zimmermann v. Associates First Capital Corp.*, 251 F.3d 376, 385 (2d Cir.2001) (quoting *Kolstad*, 527 U.S. at 546, 119 S.Ct. 2118). "This defense requires an employer to establish both that it had an antidiscrimination policy and made some good faith effort to enforce it." *Id.* Costco provides evidence regarding its antidiscrimination policies and its attempt to enforce it. Whether Costco acted in good faith, however, is an appropriate determination to be made in a motion for summary judgment. The issue of punitive damages must go to a jury.

## CONCLUSION

Defendant's motion for summary judgment on plaintiff's discrimination claim (both under Section 1981 and New York State Executive Law § 296) is granted, as is its motion for summary judgment on plaintiff's New York City Administrative Code § 8–502(a) claim. Defendant's motion for summary judgment on plaintiff's retaliation claim (both under Section 1981 and New York State Executive Law § 296) is denied, as is defendant's motion to dismiss plaintiff's claim for punitive damages.

This is the decision and order of the Court.