Judith M. PELLEGRINO, Plaintiff,

v.

COUNTY OF ORANGE, Defendant.

No. 02 CIV.1905(CM).

United States District Court,
S.D. New York.

April 7, 2004.

Sharon K. Worthy–Bulla, Orange County Attorney's Office, Goshen, NY, for County of Orange, Defendant.

Barry David Haberman, New York City, for Judith M. Pellegrino, Plaintiff.

## MEMORANDUM DECISION AND ORDER DENYING ALL PENDING MOTIONS FOR SUMMARY JUDGMENT ON FEDERAL CLAIMS, BUT GRANTING SUMMARY JUDGMENT FOR DEFENDANT AS TO THE STATE CLAIMS

McMAHON, District Judge.

Plaintiff Judith Pellegrino ("Pellegrino") brings this suit against Defendant County of Orange ("Orange County"), her employer, alleging that Defendant violated the Pregnancy Discrimination Act ("PDA") and Title VII of the Civil Rights Act of 1964 ("Title VII"), under 42 U.S.C. § 2000e *et. seq.;* New York State Human Rights Law, Executive Law § 290 *et. seq.* ("NYSHRL"); New York State Civil Service Law § 72 and § 75 ("NYSCL"); and breached her employment contract. De-

fendant moves and Plaintiff cross-moves for summary judgment on all claims, except the breach of contract claim, which appears to have been abandoned.[1]

For the following reasons, all motions as to the federal claims are denied.

## FACTS

In order to expedite my review of this matter, which involves cross-motions for summary judgment, I treat it primarily as a motion for summary judgment by Defendant. Accordingly, the following facts, taken from the parties' Rule 56 statements, are either undisputed or interpreted most favorably to Plaintiff. *New York Stock Exchange, Inc. v. Gahary*, 196 F.Supp.2d 401, 405 n. 9 (S.D.N.Y.2002).

*Relevant Collective Bargaining and Statutory Provisions*

The Orange County Department of Health ("OCDOH") hired Plaintiff Judith Pellegrino as a Public Health Nurse on September 8, 1998. (Stipulated Facts ¶ 3.) On September 4, 1999, Pellegrino became a permanent employee. (Stipulated Facts ¶ 4.) At all times prior to July 24, 2002, Pellegrino performed her duties as a Public Health Nurse in a satisfactory manner. (Stipulated Facts ¶ 5.) Effective April 19, 2002, Pellegrino was removed from payroll and deemed terminated by the Orange County Department of Personnel for taking an unauthorized leave of absence. (Affidavit of Cathy Stagmier, dated November 15, 2002, ¶ 25.)

Orange County Public Health Nurses are civil service employees. Accordingly, their employment is governed by Orange County's collective bargaining agreement ("CBA") with the Civil Service Employees Association ("CSEA") and the New York State Civil Service Law.

Article 13 of the Orange County collective bargaining agreement, dated August 11, 2000, and effective January 1, 2000, determines the procedures that must be followed when a civil service employee seeks unpaid leave. Article 13(1), states, in relevant part,

> The Employer may grant a leave of absence without pay to a permanent employee for a period not to exceed one (1) year upon receipt of written request stating the reasons and duration. Such leave may be granted for any reason ... Such leave shall be for a specific period of time ... Such employee shall submit said written request to the Commissioner of Personnel, with a copy to the employee's Department Head, whereupon the Commissioner of Personnel shall make a final decision. The decision of the Commissioner of Personnel shall be in writing and shall include the reason for said denial.

Article 13(2) states,

> In the event an employee on leave without pay as herein provided shall be confined by a physician for reasons of health, he/she shall receive paid sick leave, not to exceed his/her total accumulated sick leave, during the period of said confinement. The initiation and termination of confinement shall be determined and certified in writing by the employee's personal physician, subject to the Employer's right to verify such need with its own physician at its own expense.

Article 13(3) states,

> Employees who have prior knowledge of the need to be absent from the workplace on a leave of absence shall request, complete and return to the Department

---

1. Neither party has moved as to the breach of contract claim, but there is no reference to it in the Pre–Trial Order filed by the parties.

all paperwork regarding their leaves before the first day they are absent from work. If the absence is unforeseen or unscheduled, employees shall request, complete and return to the Department all paperwork regarding their leaves as soon as possible, but in no event later than ten (10) work days after the first day of such absence. Failure to do so may result in action in accordance with Article Twenty–Nine, Disciplinary Procedure.

Article 29, governing disciplinary procedures, provides,

> any employee who is disciplined for absence from work without consent for five or more working days shall forfeit the alternative disciplinary procedure provided herein and such employee shall be limited to the procedures provided by Sections 75 and/or 76 of the Civil Service Law.

Section 75(1) of the Civil Service Law, entitled "Removal and other disciplinary action," states, in relevant part,

> A person holding a position by permanent appointment in the competitive class of the classified civil service ... shall not be removed or otherwise subjected to any disciplinary penalty provided in this section except for incompetency or misconduct shown after a hearing upon stated charges pursuant to this section.

N.Y. Civ. Serv. L. § 75(1) (McKinney 1999). Section 75(2) of the Civil Service Law, entitled "Procedure," states, in relevant part,

> .... A person against whom removal or other disciplinary action is proposed shall have written notice thereof and of the reasons therefor, shall be furnished a copy of the charges preferred against him and shall be allowed at least eight days for answering the same in writing ... The person or persons holding such hearing shall, upon the request of the person against whom charges are preferred, permit him to be represented by counsel, or by a representative of a recognized or certified employee organization, and shall allow him to summon witnesses in his behalf.

N.Y. Civ. Serv. L. § 75(2) (McKinney 1999). Section 75(3) of the Civil Service Law, entitled "Suspension pending determination of charges; penalties," states, in relevant part, "Pending the hearing and determination of charges of incompetency or misconduct, the officer or employee against whom such charges have been preferred may be suspended without pay for a period not exceeding thirty days." N.Y. Civ. Serv. L. § 75(3) (McKinney 1999)

Section 75(4) of the Civil Service Law states, "Notwithstanding any other provision of law, no removal or disciplinary proceeding shall be commenced more than eighteen months after the occurrence of the alleged incompetency or misconduct complained of and described in the charges." N.Y. Civ. Serv. L. § 75(4) (McKinney 1999).

*Pellegrino's Leave Request*

On September 2, 1999, Marilyn J. Ejercito ("Ejercito"), the Supervising Public Health Nurse in the Newburgh Health Office and Pellegrino's direct supervisor, conducted a review of Pellegrino's job performance, which she described as "exceeds performance standards in all areas." (Affidavit of Victoria Casey ¶ 24; Casey Aff. Exh. V; Plaintiff's 56.1 Statement ¶ 3–4.) Three other Orange County employees signed-off on Pellegrino's review, including Shirley VanZetta ("VanZetta"), the Director of Patient Services, Nursing Division, Dr. Maxcy J. Smith ("Smith"), the Commissioner of Health, and John Zanetich ("Zanetich"), the Deputy Commissioner of Health. (Pl. 56.1 Statement ¶ 5.) VanZetta, Smith and Zanetich each worked at the main office of OCDOH in Goshen, New York.

On February 23, 2000, Pellegrino requested, and, on March 1, 2000, was granted, leave of absence from employment, effective from February 28, 2000 through April 28, 2000. (Stipulated Facts ¶ 6; Affidavit of Shirley VanZetta ¶ 8.) The request was for unpaid leave from March 3, 2000 through April 28, 2000. Pellegrino annexed a handwritten letter to the Leave Request Form stating that the purpose of the leave was to "attend to personal matters." The letter also indicated that Pellegrino had "a family member who has recently had frequent bouts with asthma." (VanZetta Aff. Exh. F.)

Pellegrino, Ejercito (Pellegrino's immediate supervisor), Smith (the Commissioner of Health) and J. Daniel Bloomer ("Bloomer"), the Commissioner of Personnel, each signed Pellegrino's Leave Request Form. On March 1, 2000, Shirely VanZetta, the OCDOH Director of Nursing, reviewed and approved the leave request. (VanZetta Aff. ¶¶ 8–9.)

On or about April 11, 2000, Plaintiff applied for a twelve-week leave of absence from employment pursuant to the Family Medical Leave Act ("FMLA"), effective from May 1, 2000 through July 21, 2000, the maximum permitted under FMLA. (Stipulated Facts ¶ 7.) This request was also for unpaid leave. Plaintiff submitted the appropriate supporting documentation relative to both of her leave of absence requests. (Stipulated Fact ¶ 8.) On the section marked "Reason For Request" on her second application for FMLA leave, Plaintiff checked the box labeled "your own serious health condition." (Pl. 56.1 Statement ¶ 9.)

In Orange County, additional policy guidelines govern FMLA leave requests. FMLA policy guidelines require employees requesting leave for their "own serious health condition" to present "fitness-for-duty" medical certifications to their Department Heads prior to returning to work. (Affidavit of Sharon Worthy–Spiegl, dated December 17, 2002, ¶ 13; 12/17/02 Worthy–Spegl Aff. Exh. A.) A serious health condition is "an injury, illness, impairment or physical or mental condition that involves inpatient care or continuing treatment by a health care provider." (*Id.*) Pellegrino did annex a Certification of Physician or Practitioner to her Leave Request Form. (Pl. 56.1 Statement ¶ 10; VanZetta Aff. ¶ 10.) The Certification stated that the condition for which she sought leave had commenced on or about April 2000 and that the probable duration of the condition was approximately 5 months, but did not identify a diagnosis or indicate in any other way that Pellegrino was pregnant. (VanZetta Aff. ¶ 10; VanZetta Aff. Exh. G.) Plaintiff's physician signed the Certification on April 19, 2000. (*Id.*) VanZetta approved of Pellegrino's request for leave sometime on or about May 15, 2000, after Pellegrino, Ejercito, Smith and Bloomer signed Pellegrino's Leave Request Form. (VanZetta Aff. ¶ 11.)

Defendant asserts that it was unaware that Pellegrino was pregnant at the time her second leave request was granted. However, the record clearly contains enough evidence for a reasonable trier of fact to impute knowledge of that fact to Orange County. During her deposition, Ejercito testified that "[Pellegrino] told everyone that she was pregnant prior to her requesting leave [in April 2000]," and, "I was notified by the personal department that [Pellegrino] was going to be requesting an additional leave under [FMLA] ... because she was having problems with her pregnancy at that point." (Casey Aff. ¶ 24; Casey Aff. Exh. V.)[2]

---

**2.** On April 20, 2000, Pellegrino submitted a disability insurance claim to Zurich, Orange

County's Disability Insurance Carrier, for

*Pellegrino's FMLA Leave Ends*

On May 15, 2000, Bloomer sent Pellegrino a memorandum outlining Orange County's FMLA policy guidelines, which state, "An employee's FMLA protected leave ends when the stated reason for leave ceases to exist. You are required to contact your department immediately." (Pl. 56.1 Statement ¶ 10; Haberman Aff. Exh. 23.)

By statute, FMLA leave runs for no more than 12 weeks. 29 U.S.C. § 2612(a)(1). On July 19, 2000, Zanetich sent Pellegrino a letter informing her that her FMLA leave would end on July 21, 2000, and asking that she contact her supervisor or VanZetta before that date about returning to work. (Pl. 56.1 Statement ¶ 16; Haberman Aff. Exh. 15.) The letter was carbon copied to VanZetta and Cathy Stagmier, then Deputy Commissioner for the Orange County Department of Personnel. (Stagmier Aff. ¶ 3.)

Pellegrino responded to the letter by calling Judith Farrell ("Farrell"), Senior Secretary to Zanetich, on July 20, 2000, and advising Farrell that she could not return to work because she was expecting a baby in September 2000. (Affidavit of Judith Farrell, dated November 15, 2002, ¶ 9.) Farrell claims that she told Pellegrino to submit a request for additional leave time beyond July 21, 2000, since she had exhausted her FMLA leave. Farrell also told Plaintiff that there was no guarantee that the additional leave time would be permitted. (11/15/02 Farrell Aff. ¶ 10.) Farrell also claims to have sent Pellegrino additional Leave Request Forms in the mail, and has provided photocopies of the

certified mail receipt and a post-it note stating, "7/20—Judy called—told her she could req. L/A.—sent her form. J.F." (*Id.* ¶ 12; *id.* Exh. L.)

Pellegrino never submitted any formal request for additional leave. Plaintiff contends that she asked Farrell about an extension, but was told only that such a request "would probably be denied." (Pl. 56.1 Statement ¶ 18.) Nonetheless, Plaintiff does not allege that Farrell told her not to apply. At her deposition, Plaintiff testified that she did not recall whether Farrell sent her the additional forms, and acknowledged that she did not know whether Farrell had the authority to deny her leave request. (Worthy–Spiegl Aff. ¶ 4; *id.* Exh. B.)

On August 11, Commissioner Smith sent Pellegrino a letter stating that she was on unauthorized leave. Smith's letter recited that Plaintiff should either return to work by August 15, 2000 or submit a letter of resignation. If she did neither, Orange County would commence termination proceedings against her. (Pl. 56.1 Statement ¶ 19; Haberman Aff. Exh. 16.) The letter, which was copied to Stagmier and VanZetta, directed Pellegrino to address any further questions to Farrell. (Haberman Aff. Exh. 16.)

Rather than responding to Commissioner Smith or contacting Farrell, Pellegrino sent the following vaguely worded letter to VanZetta on August 15, 2000:

Dear Mrs. Vanzetta:

I received the attached letter on August 14th, in the late afternoon regarding my return to work on August 15th. My

"complications in present pregnancy." The claim form included a section filled out by Pellegrino's physician diagnosing her condition as "I.U.P.," or in utero pregnancy, and describing her symptoms as "premature contractions, hypoglycemia, dizziness and fatigue." (Pl. 56.1 Statement ¶ 11.) Deputy

Commissioner Zanetich signed the claim form under the section entitled "Employer's Statement" on May 17, 2000. (Haberman Aff. ¶ 12; Haberman Aff. Exh. 28.) May 17 is two days after Pellegrino's leave request was granted.

apologies for any confusion regarding my employment. This has been the first time in my history of employment I have had to address leave of absence, or family/medical leave.

I was under the impression the department knew my estimated date of delivery was September 15th, 2000 which at that time along with my six week check up I could return to work. I did speak with Judy Farrell and she has explained that I am on family leave rather than medical and that it only lasts for 12 weeks. I thought it extended up to my delivery date.

I was hoping to return to my post after delivery. However, there is a strong possibility I will be sectioned so I do not know what the final outcome will be. It is not possible for me to return at this time but I wanted to touch base with you and respond to the letter I received. It's apparent the department is in the process of terminating my employment before I can actually return.

I want what is best for the department. I want to thank you for the pleasure of working for the department and hope that our paths will cross again.

Respectfully Yours,

/s/

Judith M. Pellegrino R.N. B.S.N.

(VanZetta Aff. ¶ 19; *id.* Exh. J.) Ms. Van-Zetta interpreted the letter to mean that Pellegrino "would not be returning to her employment as a Public Health Nurse." (VanZetta Aff. ¶ 19.)

There was no further contact between Pellegrino and Orange County until August 31, 2000, when Zanetich sent Pellegrino the following letter (the "August 31, 2000 Letter"):

Dear Ms. Pellegrino:

In accordance with Article Twenty–Nine, Disciplinary Procedure, of the Agreement between the County and the CSEA, you are hereby terminated effective August 31, 2000 for the following reason:

CHARGE: Absence from Work Without Consent

Specification:

On August 11, 2000 you were sent a letter informing you that your approved Leave of Absence had expired on July 21, 2000 and you were now on unauthorized leave. It was further stated in the letter, that unless you returned to work by August 15, 2000 or submitted a letter of resignation, termination proceedings would be commenced.

To date, you have not returned to work nor submitted a letter of resignation.

Pursuant to the CSEA Agreement, Article Twenty–Nine, Section 1.a., since you have been disciplined for absence from work for five working days or more, you are not entitled to the alternative disciplinary procedure provided in Article Twenty–Nine. You are limited to the procedures provided in Section 75 and/or 76 of the Civil Service Law.

You have the right to object to the notice of discipline by exercising your rights under Section 75 and/or 76 of the Civil Service Law.

Under Section 75, you have eight days from the date of this letter to file a written response to this notice.

Sincerely,

/s/

John T. Zanetich

Deputy Commissioner of Health

(Haberman Aff. Exh. 3.) The letter was copied to the Department of Personnel and the CSEA.

Orange County claims that the August 31, 2000 Letter was a form letter proposing termination as the appropriate disciplinary action for Pellegrino's absence from work without consent. Its subse-

quent behavior indicates that this was the County's understanding. According to an Orange County Personnel Payroll Charge Form submitted by Farrell to the Personnel Department on September 13, 2000, Pellegrino was "terminated & placed on 30 days suspension pending outcome of termination proceedings," effective August 31, 2000. (Def. Main Brief at 4, 24; 10/15/02 Stagmier Aff. ¶ 24; *id.* Exh. DD.) Subsequent Forms indicate that she retained her position through April 19, 2002, although she did not receive a paycheck. (*Id.*) By contrast, Pellegrino interpreted the August 31, 2000 letter as a termination letter.

On September 5, 2000, Pellegrino sent a reply letter to the August 31 letter, which reads rather differently than her letter of August 15 (a letter VanZetta had actually interpreted as a letter of resignation),

Dear Mr. Zanetich:

In response to your recent letter please find enclosed a copy of my estimated date of delivery regarding my pregnancy status. I did respond to the letter I received from Dr. Smith dated August 11th, 2000 in that, I am on a medical leave and could not return to work until my postpartum check up. I was under the impression based on the information provided by my doctor that I was on a formal medical leave at which time I would return to work upon clearance from my doctor to do so. This has been a very confusing time for me, *but I am clearly stating to you I did not abandon my post.* (Emphasis added). Please find attached my estimated date of delivery of 9/13/00. I am writing to put you on notice should this be placed in my file that again I did not abandon my post, that I have responded to all correspondence the department has sent me within the options that were afforded me which were to return August 15th, 2000 or be terminated. Thank you for time regarding this matter.

Respectfully Yours,
/s/
Judith M. Pellegrino R.N.
(11/15/04 Farrell Aff. ¶ 17; *id.* Exh. N.)

*Article 75 Proceedings*

On September 7, 2000, Commissioner Smith asked Chris Dunleavy ("Dunleavy"), Administrative Officer, to hear and render a decision under the Civil Service Law § 75 pursuant to the August 31, 2000 Letter. On September 13, 2000, Dunleavy designated Col. Theodore Catletti, Corrections Administrator, to hear and render a final decision in Pellegrino's matter.

Beginning on October 4, 2000, Col. Catletti sent Pellegrino a series of letters regarding the scheduling of the hearing on the charges outlined in the August 31, 2000 Letter. The October 4, 2000 Catletti letter advised Pellegrino that the hearing was scheduled to take place on November 21, 2000. On October 11, 2000, Col. Catletti sent Pellegrino a letter postponing the § 75 hearing from November 21, 2000 to January 31, 2001. On October 19, 2000 Col. Catletti sent Pellegrino a letter rescheduling the § 75 hearing from January 31, 2001 to December 13, 2000. Between November 12, 2000 and October 3, 2001, the hearing was repeatedly rescheduled due to the unavailability of the parties and/or the unavailability of the Hearing Officer.

On November 20, 2000, Smith sent Pellegrino a letter directing her to return to work on November 29, 2000, pending the outcome of the hearing. The letter was copied to Ejercito. Pellegrino did not return to work, but instead, on November 30, 2000, Plaintiff alleges that she telephoned Ejercito in an attempt to clarify her employment status. Ejercito and Pellegrino differ in their recollections of when that conservation occurred and what was said during it. First, Plaintiff claims that,

although she called Ejercito in the Newburgh office, the call was transferred to Ejercito in the Goshen office. Plaintiff next alleges that Ejercito told her that "[her office is] short-staffed as ever, extra paperwork, and that although family comes first, [she] need[s] to consider that this is a full-time and not a part-time position and that it would be difficult ... to take off should [her] children become sick." (Pellegrino Deposition Transcript, 12/17/02 Worthy–Spiegl Aff. Exh. B.) Finally, Ejercito professed not to be aware of the August 31, 2000 Letter, and told Pellegrino that she "couldn't" answer any questions regarding her employment status. (*Id.*)

By contrast, Ejercito testified at her deposition that Pellegrino told her, on November 28, 2000, that

> she just received the [November 20, 2000] letter ... and that she didn't feel she would be able to return to work on November 29th because it was short notice. She indicated to me that she might be able to return the following Monday, and then started asking me questions about what would occur if she came back to work.

(Ejercito Deposition Transcript, 12/17/02, Casey Aff. ¶ 24; *id.* Exh. V.) In response to Pellegrino's inquiries as to her employment status, she explained that it was obvious that Pellegrino had not been terminated because she was being requested to return to work. Pellegrino allegedly replied that "she didn't feel comfortable working until the hearing because she felt that she didn't want to trust a hearing officer to make the decision as to whether or not she would have her position or not and come back to work and work all that time for nothing." (*Id.*) Pellegrino further stated that

> she had contacted the department of labor who advised her that the County had discriminated against her and termi-

nated her because she was pregnant, and she also indicated that the only reason that they had a problem with this was because she had tried to apply for unemployment benefits and had been denied. She indicated to me that the County was responsible for that happening.

(*Id.*) Ejercito declined to address this issue, and instead referred Pellegrino to her union representative. Pellegrino told her that she had attempted to call her union representative several times, but the representative had not returned her calls. Ejercito then claims to have referred Plaintiff to Cathy Stagmier in Personnel. Plaintiff denies that Ejercito ever referred her to Stagmier.

Plaintiff then telephoned Stagmier, who told Pellegrino that questions regarding her employment status would be addressed at the § 75 hearing, and refused to further "discuss the merits of the issues." (Pl. 56.1 Statement ¶¶ 24–26.) On November 30, 2000, Pellegrino sent a follow-up letter to Ejercito memorializing the points she had raised during her earlier telephone conversation. The letter stated, in relevant part, "I was terminated effective August 31st, 2000 by Mr. John T. Zanetich ... and I have not heard from anyone since then, which is about four months. I don't know what changed that the department suddenly wants me to return. Am I rehired after being terminated? ?" (11/15/04 Farrell Aff. ¶ 17; 11/15/04 Farrell Aff. Exh. N.) It also stated, "My CSEA representative has not been able to get back to me as I have tried to reach her several times." (*Id.*)

On December 20, 2000 Zanetich sent Pellegrino a letter which stated, in relevant part,

> Pursuant to Section 75 of the Civil Service Law, the hearing officer renders a final decision on whether to sustain the

County's proposed sanction of terminating your employment from the County, as stated in the August 31, 2000 letter to you. Your hearing is scheduled for January 9, 2001. In the meantime, while you are still a County employee and a hearing and decision are pending on the charge outlined in your August 31, 2000, notice of discipline, you are directed to return to work ... [effective January 21, 2001 at 9:00 am].

(*Id.*) Again, Pellegrino refused to return to work, but instead sent Zanetich a letter, dated December 22, 2000, which stated, in relevant part,

Enclosed please find a letter from Maxi Smith date August 11th, 2000 directing me to return to work by Tuesday August 15th, 2000. I was in my eighth month of pregnancy and remained under the care of my doctors. By directing me to return to work at this time, would have placed me in the position of going against doctor's orders and in essence I was directed to place the health and welfare of my unborn child in jeopardy. I have not heard from you or anyone from the department since August. *It has come to my understanding that if I was suspended it should have been for 30 days, and that I should have been put back to work at that time* ... (Emphasis added).

I now receive a letter from you dated December 20th, directing me to report to work January 2nd, 2001 just days before my January 9th, 2001 hearing to support the county's proposed sanction of terminating my employment with the county.

I found this letter most offensive. You are asking me to return to an institution that supports terminating an employee who exceeded performance standards in the areas of public health nursing because I became ill during a pregnancy that was beyond my control and under the care of a doctor.

I am requesting no further contact from you at this time ... These letters are upsetting and insulting to the professionalism I have demonstrated to my department while employed. I will await the outcome of the hearing [then scheduled for January 9th, 2001]."

(*Id.*) The letter was copied to Ron Green CSEA President.

On March 27, 2001, no Article 75 hearing yet having been held, Pellegrino served a Notice of Claim against Orange County, alleging wrongful termination. Her deposition was taken on May 24, 2001 pursuant to § 50–h of the New York State General Municipal Law. Pellegrino's Article 75 hearing, which had been repeatedly postponed, was by now set for May 30, 2001. It did not take place because Col. Catletti was no longer employed by Orange County.

On July 12, 2001, Dunleavy designated a new Hearing Officer, Victoria Casey ("Casey"), to hear and render a final decision in Pellegrino's § 75 matter. By letter dated July 25, 2001, Casey notified Pellegrino of her appointment as Hearing Officer and advised her that the hearing would take place on August 10, 2001. The hearing was adjourned until October 30, 2001, at which time all parties finally appeared together with their respective counsel.

At the hearing, Pellegrino's counsel asserted that Civil Service Law § 75 required a pre-termination hearing and that because Pellegrino had been terminated on August 31, 2000, the hearing was being held in violation of § 75. The Hearing Officer concluded that the matter was properly before her. She stated that Pellegrino had not yet been terminated and continued to hold rights to her position as a Public Health Nurse with Orange County in accordance with the Collective Bar-

gaining Agreement and the Civil Service Law. Casey stated that it was her responsibility to hear the facts of the case so as to determine whether the charges and proposed penalty of termination should be sustained. At Plaintiff's request and over Orange County's objections, Casey adjourned the hearing to November 27, 2001.

On November 26, 2001, Plaintiff's Counsel, Barry Haberman ("Haberman"), called Casey to inform her that neither he nor his client would appear at the hearing, since such appearance would essentially be an admission that Pellegrino had not yet been terminated from her position. Casey advised Haberman that the hearing would go forward as scheduled. (Affidavit of Victoria Casey, dated November 15, 2002, ¶¶ 20–21.)

On November 27, 2001, Orange County presented its case, calling seven witnesses and producing 14 exhibits in addition to the previous 14 exhibits submitted jointly by the parties at the initial hearing. Inasmuch as neither Plaintiff nor her counsel appeared, Orange County's evidence was uncontroverted.

By letter dated March 7, 2002, Casey advised Pellegrino that she had a right to submit to her any mitigating materials and/or exculpatory factors to reduce the penalty. (Casey Aff. ¶ 28; id. Exh. W.) At Haberman's request, Casey extended the time within which Plaintiff and her counsel could review the record and submit any exculpatory evidence. (Casey Aff. ¶ 29; id. Exh. X.) However, Plaintiff did not present Casey with any such evidence. (Casey Aff. ¶ 33.)

In a decision dated April 15, 2002, Casey sustained the charges of being absent without leave. She found that the termination date was July 22, 2000. (Casey

Aff. ¶ 34; id. Exh. Z.) On June 18, 2002, Casey amended her Decision to make termination effective as of April 15, 2002. (Casey Aff. Exh. BB.) At that point, Orange County removed Pellegrino from its payroll.[3]

On July 24, 2002, by Order to Show Cause, Pellegrino commenced an action in the New York State Supreme Court in Orange County pursuant to Article 78 and CPLR § 2201. In that action, Pellegrino alleges that the determination of Hearing Officer Casey was arbitrary and capricious and against the weight of the documentary evidence. On August 23, 2002, Orange County moved to dismiss the Petition as time-barred. Pellegrino filed opposition papers on October 28, 2002. The matter was subsequently transferred to the New York State Supreme Court in White Plains.

On April 9, 2003, the court issued an order denying Defendant's motion to dismiss, and transferring the matter to the Appellate Division, Second Department pursuant to the Civil Practice Law and Rules § 7804(g), which requires the Appellate Division to resolve the question of whether Hearing Officer Casey's § 75 determination was supported by substantial evidence. See CPRL § 7804(g). On February 6, 2004, the Appellate Division dismissed Plaintiff's action for failure to perfect a timely appeal pursuant to 22 NYCRR 670.8.

*The Instant Action*

On June 18, 2001, Pellegrino filed a Verified Complaint with the EEOC, alleging wrongful termination of her employment based on her pregnancy. The County filed an answer on August 10, 2001.

---

**3.** Pellegrino has not been paid by Orange County since March 3, 2000 (12/17/02 Wor-    thy–Spiegl Aff. ¶ 8.)

On March 8, 2002, Pellegrino commenced the instant action in this Court for unlawful termination of her employment for discriminatory reasons in violation of the PDA, NYSHRL § 290 *et seq.*, NYSCSL § 75, and for breach of her employment contract. The Verified Complaint seeks back pay in the amount of $45,000.00, front pay in the amount of $900,000.00 and health benefits and pension funding in the amount of $250,000.00.

The EEOC complaint and this complaint were of course filed prior to any final adjudication in the Article 75 hearing.

### DISCUSSION

#### I. *Standard for Summary Judgment*

Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Ticali v. Roman Catholic Diocese of Brooklyn,* 41 F.Supp.2d 249, 254 (E.D.N.Y.1999). A genuine factual issue exists if there is sufficient evidence favoring the nonmovant for a reasonable jury to return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Ticali,* 41 F.Supp.2d at 254. In deciding whether summary judgment is appropriate, the court resolves all ambiguities and draws all permissible factual inferences against the movant. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. Summary judgment is warranted when the nonmovant has no evidentiary support for an essential element on which it bears the burden of proof. *Celotex,* 477 U.S. at 322–

23, 106 S.Ct. 2548; *Silver v. City Univ. of N.Y.,* 947 F.2d 1021, 1022 (2d Cir.1991).

#### II. *The PDA and the New York Human Rights Law*

The PDA amends Title VII to provide that women "affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work ..." 42 U.S.C. § 2000e(k).

In pertinent part, the New York Human Rights Law, New York Executive Law § 296(1) ("HRL") states that

It shall be unlawful discriminatory practice:

(a) For an employer ... because of the ... sex ... of any individual, to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

N.Y. Exec. Law § 296(1)(a).

Pellegrino argues that Orange County discriminated against her because of her pregnancy by engaging in disparate treatment during her employment and by terminating her because of her pregnancy. Orange County disputes this, claiming that Pellegrino's termination resulted from her absence from work without the consent of Orange County, her employer.

In determining whether to grant a motion for summary judgment in a Title VII case, a district court must apply the three-step burden shifting analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In step one, the court must first determine whether the employee has established a prima facie case of discrimination. An appropriate showing

by the employee raises the presumption that the employer unlawfully discriminated against the employee and shifts the burden of production to the employer to articulate some legitimate nondiscriminatory reason for the employee's rejection. If the employer carries this burden, the employee must demonstrate that the legitimate reasons offered by the employer were a pretext for discrimination. *Flores v. Buy Buy Baby, Inc.*, 118 F.Supp.2d 425, 430 (S.D.N.Y.2000). The same analysis applies to claims brought under the New York Discrimination Law. *Id.*, at 429–30; *see also Noyer v. Viacom, Inc.*, 22 F.Supp.2d 301, 305 n. 2 (S.D.N.Y.1998) (citing *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 n. 4 (2d Cir.1995)).

### A. *Prima Facie Case*

In order for Pellegrino to make a prima facie case of employment discrimination, she must establish that (a) she is member of a protected class; (b) she satisfactorily performed the duties required by her position; (c) she was discharged; and (d) the discharge occurred under circumstances giving rise to an inference of unlawful discrimination. *Quaratino v. Tiffany & Co.*, 71 F.3d 58 (2d Cir.1995) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 793, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

▮▮▮ Defendant argues that Plaintiff failed to establish a prima facie case. I disagree. Plaintiff has produced evidence to support her contentions that (a) she is a member of a protected class (pregnant women); (b) she performed her job satisfactorily; (c) she lost her job; and (d) the process by which she lost her job began shortly after Plaintiff's supervisors

learned that she was pregnant. Evidence of temporal proximity between an employee's request for maternity leave and her termination is sufficient to establish an inference of discrimination. *Flores*, 118 F.Supp.2d at 431.[4] Moreover, because "[t]he burden on the plaintiff of presenting a prima facie case under *McDonnell Douglas* is 'minimal,'" *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir.2001) (quoting *James v. New York Racing Ass'n*, 233 F.3d 149, 153 (2d Cir.2000)), and "the only purpose served by the prima facie case is to force the defendant to articulate a non-discriminatory reason for the termination ... it is the rare case in which a defendant will not have proffered such a reason." *Lanahan v. Mut. Life Ins. Co. of New York*, 15 F.Supp.2d 381, 384 (S.D.N.Y.1998). I agree with an increasing number of courts in this Circuit that, on all but the rarest of motions for summary judgment, we should simply assume, for purposes of this motion only, that plaintiffs have established a prima facie case. *See, e.g., Devlin v. Transp. Communications Intern. Union*, 2002 WL 413919, Nos. 95 Civ. 0742(JFK), 95 Civ. 10838(JFK), at *7 (S.D.N.Y. Mar. 14, 2002); *Lanahan*, 15 F.Supp.2d at 384; *Lapsley v. Columbia University–College of Physicians & Surgeons*, 999 F.Supp. 506, 514–15 (S.D.N.Y.1998); *see also Roge*, 257 F.3d at 168 (declining to reach question of whether plaintiff established a prima facie case because defendant met its burden of putting forth legitimate, nondiscriminatory reasons and plaintiff failed to proffer sufficient evidence of pretext).

### B. *Nondiscriminatory Rationale*

▮▮▮ Once a plaintiff establishes a prima facie case, a defendant must produce evi-

---

**4.** For our purposes, it is irrelevant whether we use the date when Ejercito learned that Plaintiff was pregnant (in or about April 2000) or the date when Farrell learned of it (mid-July 2000). For purposes of the prima facie case analysis, I am prepared to assume that both are sufficiently proximate in time to August 31, 2000, when the process of ending Plaintiff's job was set in motion.

dence that its adverse actions toward plaintiff occurred for some legitimate, non-discriminatory reason. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Byrnie v. Town of Cromwell Bd. of Educ.,* 243 F.3d 93, 102 (2d Cir. 2001). A defendant "need not persuade the court that it was motivated by the reason that it provides; rather, it must simply articulate an explanation that, if true, would connote lawful behavior." *Greenway v. Buffalo Hilton Hotel,* 143 F.3d 47, 52 (2d Cir.1998). In other words, it is a burden "of production, not persuasion." *Reeves,* 530 U.S. at 142, 120 S.Ct. 2097.

■ Orange County meets this *de minimis* burden by asserting that it terminated plaintiff from her position because she was absent without leave for more than five days—a stated ground for termination under the CBA that governed her workplace. *Mullen v. City of New York,* No. 02 Civ.103 (SAS), 2003 WL 21511952, at *6 (S.D.N.Y. July 1, 2003) ("Absent protection under section 296 of the New York Executive Law for employees with disabilities, absenteeism is a legitimate reason for termination").

Thus, all that is left is to decide whether Plaintiff has raised a genuine issue of material fact about whether that reason was merely a pretext for discriminating against her because of her pregnancy. On the record before me I conclude that she has. Therefore, Defendant's motion for summary judgment must be denied. Plaintiff has, however, done *no more than raise a disputed issue,* so her cross-motion for summary judgment must also be denied.

## C. Pretext

To show pretext, in the context of a summary judgment motion, "the plaintiff must establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for discharging her is false *and* as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 401 (2d Cir.1998) (quoting *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1225 (2d Cir.1994)) (emphasis added). The factual inquiry on the question of pretext is substantially more specific than for the prima facie case. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 516, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). However, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

■ Pellegrino argues that the reasons Orange County offers for its decision to terminate her were pretextual, based on (1) the temporal proximity between Orange County's gaining awareness that Pellegrino was pregnant and its decision to terminate her employment; (2) Orange County's treating her differently from other County employees by refusing to place her on involuntary leave due to the complications with her pregnancy; (3) Orange County's failure to grant her a pre-termination hearing in violation of Civil Service Law § 75(1); and (4) Orange County's failure to pay her following her 30–day suspension in violation of Civil Service Law § 75(3).

■ "Temporal proximity, standing alone, is insufficient to carry plaintiff's burden at step three." *Bombero v. Warner–Lambert Co.,* 142 F.Supp.2d 196, 210 n. 28 (D.Conn.2000) (collecting cases). Only "strong temporal correlation," standing

alone, is sufficient to sustain an inference of discrimination.

It is uncontroverted that Plaintiff's immediate supervisor was aware of her pregnancy prior to the time she requested and received 12 weeks of FMLA leave—even though Plaintiff did not mention that fact in her request for leave and there is no evidence that any of the other supervisors who were involved in the leave-approval process (Van Zandt, Smith and Bloomer) knew Plaintiff was pregnant as early as May 2000, when they approved her FMLA leave. Plaintiff asks me to conclude as a matter of law that Orange County was on notice of her pregnancy as early as April 2000, based on Ejercito's knowledge of her condition and the payment to her of disability benefits by the County's insurer.[5] In the absence of any evidence from the County suggesting otherwise (and there is none in the record), I agree with Plaintiff that the knowledge of her immediate supervisor can be imputed to the County. This means, viewing the facts as Plaintiff wishes me to view them, that there was a four-month gap between the time the County became aware of Plaintiff's pregnancy and the time it took the first action tending to lead to her termination (the August 31 letter).

A four month temporal gap between knowledge of pregnancy and adverse employment action is considered quite weak temporal correlation in this Circuit. *Clark County School District v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001); *Gorman–Bakos v. Cornell Cooperative Extension of Schenectady Co.*, 252 F.3d 545, 554 (2d Cir.2001) (dismissing employment discrimination claim where

time between protected activity and adverse employment action exceeded five months); *Cobian v. New York City*, No. 99 Civ. 10533 KMWAJP, 2000 WL 1782744, at \*16 (S.D.N.Y. December 6, 2000), *aff'd*, No. 01–7575, 2002 WL 4594 (2nd Cir.2001) (dismissing employment discrimination case where there was a four month lapse between protected activity and adverse action).[6]

However, even a weak temporal correlation gains in persuasiveness if there is other evidence tending to support an inference of discrimination. Plaintiff advances three contentions in this regard.

*1. Discriminatory Treatment*

Plaintiff first claims that Defendant's discriminatory motives can be inferred from the fact that she was treated differently from other similarly situated employees. "Disparate treatment occurs where an employer 'treats some people less favorably than others' because of their [pregnancy], or where a facially neutral policy is merely a pretext for intentional discrimination." *Lehmuller v. Incorporated Village of Sag Harbor*, 944 F.Supp. 1087 (E.D.N.Y.1996) (quoting *Connecticut v. Teal*, 457 U.S. 440, 446, 102 S.Ct. 2525, 2530, 73 L.Ed.2d 130 (1982)).

Orange County counters that Pellegrino "has not been treated differently than any other employee who fails to return to work as expected following the expiration of FMLA leave and who is then considered on an unauthorized leave of absence" (10/15/02 Stagmier Aff. ¶ 18), and the record contains no evidence that Plaintiff was treated differently than other similarly sit-

---

**5.** I need not reach the latter question in order to determine this motion, and I decline to do so.

**6.** In a recent case, I determined that three months was sufficient temporal proximity for purposes of deciding whether plaintiff had

made out a prima facie case, *Santos v. Costco Wholesale, Inc.*, 271 F.Supp.2d 565, 575 (S.D.N.Y.2003). Of course, we are now beyond the prima facie case stage, so Plaintiff must demonstrate something stronger than was required of Santos.

uated employees who failed to return to work after their authorized leaves expired. So plaintiff has not raised a disputed issue of material fact on this score.

Plaintiff further argues that, because she was medically unable to return to work on August 31, 2000, Orange County should have placed her on involuntary medical leave without pay under Civil Service § 72, rather than start proceedings leading to termination under § 75. Again, Plaintiff does not offer a shred of evidence that the County invoked § 72 rather than § 75 in cases where other pregnant or medically disabled persons who (1) used up their FMLA leave, but (2) did not seek or obtain additional leave. So she has not satisfied her burden of raising a genuine issue that the County's decision to deal with her situation under § 75 constituted disparate treatment.[7]

### 2. Failure to Invoke Civil Service Law § 72

The mere fact that Plaintiff had a medical condition does not mean Orange County was required to place Plaintiff on involuntary leave. Civil Service Law § 72 provides "When in the judgment of an appointing authority an employee is unable to perform the duties of his or her position by reason of a disability ... the appointing authority may require such employee to undergo a medical examination to be conducted by a medical officer selected by the civil service department ...." N.Y. Civ. Serv. L. § 72(1) (McKin-

ney 1999). Further, "If, upon such medical examination, such medical officer shall certify that such employee is not physically or mentally fit to perform the duties of his or her position, the appointing authority shall notify such employee that he or she may be placed on leave of absence." *Id.*

■ Section 72 is entirely discretionary. An employer is not legally obligated to commence proceedings under Section 72 against an employee who takes an unauthorized absence from employment due to medical incapacity. *Garayua v. Board of Educ. of Yonkers City School Dist.,* 248 A.D.2d 714, 714, 671 N.Y.S.2d 278, 278 (2d Dep't.1998) ("While the petitioner contends that her case should have been governed by the provisions of Civil Service Law §§ 72 and 73 because her absenteeism was due to her physical incapacity, even charges of nonwillful absenteeism may be adjudicated in a proceeding pursuant to Civil Service Law § 75"). Thus, if plaintiff was AWOL, Orange County was privileged to deal with her under § 75.

The undisputed evidence in this case establishes that Pellegrino was AWOL beginning on July 15, 2000, when her FMLA leave expired. Plaintiff could have requested additional medical leave after her FMLA leave expired. Her CBA entitled her to ask for as much as one year's unpaid leave of absence—far more than the 12 weeks FMLA allows.

---

**7.** When a motion for summary judgment is made, a party is required to "lay bare his proof"—that is, to provide the Court with competent evidence in support of her position. Here, in opposition to Defendant's motion for summary judgment, Plaintiff mentions the "talisman" of disparate treatment but offers no evidence that any other Orange County employee who was similarly situated to her was treated differently. Since, on a motion for summary judgment, the Court is

permitted to narrow the issues and to resolve any as to which no genuine issue of fact is raised, *see Post v. Elser,* No. 92–CV–1146, 1996 WL 406843, at *9 (N.D.N.Y. July 19, 1996), I resolve the issue of disparate treatment against Plaintiff. She will not be permitted to pursue it at trial, because she did not raise any genuine issue of fact as to this issue at the summary judgment stage. *Weiss v. La Suisse, Societe D'Assurances Sur La Vie,* 293 F.Supp.2d 397, 408 (S.D.N.Y.2003).

But Pellegrino did not ask for additional leave. Farrell's undisputed testimony establishes that Plaintiff was sent forms to use in requesting additional leave.[8] Plaintiff never sent in the forms. Even assuming that Farrell told Plaintiff her request would not likely be granted (a disputed fact, which I cannot resolve on this motion), Plaintiff could not simply assume that her request would be denied and so decline to ask. *Cf. Mullin v. Rochester Manpower, Inc.*, 204 F.Supp.2d 556, 562–63 (W.D.N.Y.2002) (pregnant employee making FMLA claim required to prove that she requested leave and was denied it).

Plaintiff's right not to be discriminated against under Title VII, the PDA and possibly even the Americans with Disabilities Act (assuming she was having a difficult pregnancy, as appears to be the case) would have made it difficult for the County to deny her additional medical leave, if only she had followed the procedure outlined in the CBA and made a formal request.[9] But inexplicably—and, I must add, unreasonably—she did not do so. Plaintiff may have been confused about the difference between FMLA leave and other medical leave, but her confusion did not entitle her to disregard contractually-mandated procedures (like requesting additional medical leave) and just assume that someone would or should give it to her.

Pellegrino was indisputably AWOL as of the date her FMLA leave expired. Be-cause the relevant facts are either undisputed or were not controverted with admissible evidence, Pellegrino will not be permitted to re-litigate this issue at trial.

Once Defendant decided to initiate termination proceedings against Plaintiff, it had no choice but to proceed under Civil Service Law § 75. Article 29 of the CBA limits disciplinary procedures for unauthorized leaves of absence for five or more working days to "the procedures provided by §§ 75 and/or 76 of the Civil Service Law." Because Plaintiff was AWOL for more than five working days, the CBA precluded Defendant from initiating proceedings under § 72 of the Civil Service Law. Therefore, no reasonable trier of fact could conclude that Defendant's decision to charge Plaintiff under § 75, instead of § 72, is evidence of Defendant's discriminatory intent.

*3. Failure to Follow Proper Procedure*

Plaintiff also contends that discriminatory intent can be inferred from procedural irregularities attendant to her departure. Plaintiff argues that Orange County (1) failed to hold a pre-termination hearing or (2) failed to pay her beginning thirty days after her suspension. Each of these allegations underlies a pendent claim under New York law as well.

Assuming arguendo that there were procedural irregularities (and for reasons set forth below I conclude that there were

---

**8.** Plaintiff's lack of recollection of receiving the forms does not suffice to create a genuine issue of fact in the face of Farrell's sworn statement that the forms were sent. *See Lazar's Auto Sales, Inc. v. Chrysler Financial Corp.*, 83 F.Supp.2d 384, 389 (S.D.N.Y.2000); *Constitution Reinsurance Corp. v. Stonewall Ins. Co.*, 980 F.Supp. 124, 129 (S.D.N.Y. 1997); *Costello v. St. Francis Hosp.*, 258 F.Supp.2d 144, 148 (E.D.N.Y.2003). Therefore, the issue of whether or not Farrell sent her forms is resolved against her, for failure to controvert it on this motion. At trial, the jury will be advised that the forms were in fact sent.

**9.** FMLA permits employers to require their employees to exhaust FMLA leave before taking any other leave to which they might be statutorily or contractually entitled. 29 U.S.C. § 2612(d). Orange County requires the exhaustion of FMLA leave (which it cannot deny to an employee) before it considers a request for further leave (the granting of which is discretionary, but subject to law).

not), had they occurred prior to Orange County's decision to commence termination proceedings against Pellegrino, Plaintiff could argue to the jury that they were additional evidence of pretext. *See Stern v. Trustees of Columbia Univ. in the City of New York*, 131 F.3d 305, 313 (2d Cir.1997) (quoting *Zahorik v. Cornell Univ.*, 729 F.2d 85, 93 (2d Cir.1984) ("While [courts should] not second-guess an employer's hiring [or termination] standards, the reasons for its employment decision, including its alleged reliance on such standards, are subject to scrutiny under [the law], and '[d]epartures from procedural regularity,' for example, 'can raise a question as to the good faith of the process *where the departure may reasonably affect the decision.'*") (Emphasis added).

However, only procedural irregularities in making the adverse employment are indicative of discriminatory intent. *See, e.g., Shannon v. Fireman's Fund Ins. Co.*, 156 F.Supp.2d 279, 292 (S.D.N.Y.2001) (failure to consider performance appraisals and interviews in deciding whether to terminate employee is evidence of discriminatory motive). Here, the decision to try to terminate plaintiff's employment by invoking § 75 was made some time prior to August 31, 2000, when the letter was sent. Both the alleged failure to hold a hearing and the failure to recommence paying plaintiff her salary at the end of the thirty day suspension period under § 75(3) occurred after the decision to commence termination proceedings was made. For that reason, the procedural irregularities did not occur in the context of making the decision and are not evidence of discrimination.

### 4. Pretextual Motive

Unfortunately for Defendant, this narrowing of the issues does not dispose of the matter in its favor. Orange County indeed had grounds to initiate § 75 proceedings against Pellegrino, and it was free to do so. But it is possible to do the right thing (proceed under § 75) for the wrong reason (because someone is pregnant). If Orange County decided to invoke its rights under § 75 because Plaintiff was pregnant, and it feared that she would be a less effective employee once she had a child, we would have a classic case of pretext—of an employer-defendant saying it was acting for a legitimate reason while secretly being motivated by another.

As to this one issue, Plaintiff has succeeded (barely) in raising a disputed issue of material fact. Different witnesses offer dramatically different versions of various key conversations. Plaintiff swears to statements made to her by Farrell and Ejercito—statements that suggest Orange County did not wish to continue to employ her because she was having or had delivered a child ("Your request for additional leave will probably be denied," "It would be difficult to take off should your children become sick.") Of course, Farrell and Ejercito deny making these statements, but all that does is create a disputed issue of fact about why Orange County chose to commence disciplinary proceedings against Plaintiff with a view to firing her when it did.

Accordingly, neither party is entitled to summary judgment on Plaintiff's PDA and NYSHRL claims. The single issue of whether pregnancy or absence without leave was the real reason the County chose to invoke its undoubted rights under Article 75 will be tried to a jury.

### III. New York Civil Service Law

Plaintiff alleges that Orange County violated § 75(1) of the New York State Civil Service Law by terminating her without fair notice and a hearing. (Complaint at ¶ 58). Defendant counters that Pellegrino's § 75 Civil Service Law claims should

be dismissed because of the pendency of Pellegrino's Article 78 appeal. In the alternative, Defendant argues that it has not violated § 75.

Since Defendant filed its motion, Plaintiff's state action has been dismissed for failure to perfect her appeal.[10] Thus, Defendant's jurisdictional argument is moot.

But Plaintiff's claim must be dismissed on the merits because she did in fact have her pre-termination hearing.

### A. The Pre–Termination Hearing

Plaintiff alleges that Orange County terminated her on August 31, 2000 in violation of § 75. Civil Service Law § 75 requires that a permanent status civil service employee like Pellegrino be provided a pre-termination hearing, written notice of the charges to be presented prior to the hearing and the opportunity to be represented by counsel and to call witnesses at the hearing. It also requires that the hearing be commenced within 18 months of the date of the alleged misconduct. As the hearing officer in this matter determined, Orange County satisfied each of the requirements.

█ A hearing was in fact held, beginning on or about October 30, 2001. The County argues that this was a § 75 hearing, and points to the fact that it did not remove Pellegrino from its payroll until the hearing officer rendered a decision after that hearing (in which Plaintiff, by her own choice, played no part). The fact that Orange County personnel records continued to list Pellegrino until April 15, 2002 is of course not dispositive. In this Circuit

> An actual discharge, in the context of Title VII as in other contexts, occurs when the employer uses language or

engages in conduct that 'would logically lead a prudent person to believe his tenure has been terminated' ... Formal words of termination are not required and the inquiry should focus instead on the reasonable perceptions of the employee.

*Chertkova v. Connecticut General Life Ins. Co.*, 92 F.3d 81, 88 (2d Cir.1996) (quoting *NLRB v. Trumbull Asphalt Co.*, 327 F.2d 841, 843 (8th Cir.1964)). Plaintiff contends that the wording of the August 31, 2000 Letter—which began as follows: "In accordance with Article Twenty–Nine, Disciplinary Procedure between the County and the CSEA, you are hereby terminated effective August 31, 2000 for the following reason: CHARGE: Absence from Work Without Consent"—made it reasonable for her to perceive that she was terminated on August 31, 2000.

Viewing the text of the letter in its entirety, I am constrained to disagree.

Reasonableness determinations are, of course, quintessential jury issues, so summary judgment on the reasonableness of someone's interpretation is appropriate only when no reasonable person could have assigned a particular meaning to the words used. *See Yesner v. Spinner*, 765 F.Supp. 48, 51 (E.D.N.Y.1991) (when "words are susceptible of several meanings, one of which is defamatory, it is for the jury to decide in which sense the words were used"); *Slater Elec., Inc. v. Thyssen–Bornemisza Inc.*, 650 F.Supp. 444, 458 (S.D.N.Y.1986) ("summary judgment of infringement cannot be granted when a genuine dispute exists as to the meaning of the terms of a claim"). Orange County's August 31, 2000 letter is, to put it mildly, infelicitously phrased. It starts by saying "you are hereby terminated effective Au-

---

**10.** I assume the appeal was abandoned so that plaintiff would not be confronted in this action with allegations of res judicata or collateral estoppel in the event she did not prevail in the Second Department.

gust 31, 2000." If that were all the letter said, no reasonable person could conclude anything other than that Plaintiff was fired on August 31, 2000.

But the letter goes on. It explains that Plaintiff's discharge is disciplinary in nature and that disciplinary terminations are governed by Sections 75 and 76 of the Civil Service Law. Most important, it says that Plaintiff "[has] the right to object to the notice of discipline by exercising your rights under Section 75 and/or 76 of the Civil Service Law. Under Section 75, you have eight days from the date of this letter to file a written response to this notice." Based on the totality of the language in the letter, no rational juror could find that Plaintiff was being fired without the pre-termination hearing that § 75 guaranteed her.

As a member of CSEA and civil service protected employee, Pellegrino is charged with at least a basic knowledge of the procedures governing her rights upon proposed termination under the collective bargaining agreement. *Henry v. Community Resource Center, Inc.*, No. 95 Civ. 5480(AJP)(JGK), 1996 WL 251845, at *7, (S.D.N.Y. May 13, 1996) (plaintiff's alleged ignorance of union procedures did not excuse plaintiff from conforming with exhaustion requirement) (collecting cases). Article 29(2)(b) of the CSEA collective bargaining agreement specifically references Civil Service Law § 75 and otherwise outlines the procedures to be followed upon receipt of a Notice of Discipline.[11] These

procedures include an eight-day window for the employee to file a written response to the Notice, followed by a pre-termination hearing. N.Y. Civ. Serv. L. § 75(1). The August 31, 2000 letter references the relevant statute and tells Plaintiff that if she objects to being fired, she should file a response within eight days. Despite Defendant's inept phraseology, it is not reasonable for a civil service employee to assume that she has already been fired when the very letter that announces this disciplinary act also advises her to enter an objection to discipline within eight days and refers her to a provision of the law that entitles her to a hearing.

It was certainly reasonable for Pellegrino to be confused by the August 31 letter, since it contained seemingly contradictory elements: "you are fired effective today" coupled with "you have certain rights under the Civil Service Law" and "please mount a defense to this charge of being absent without leave within the next eight days." However, the very fact that the letter on its face said two different things made it unreasonable for Plaintiff to interpret it as if it only said one of those things. As a CSEA member, Plaintiff had a way to clear up any confusion about what this court concedes is a confusing letter. But there is no evidence that Plaintiff consulted with her union representative or with counsel upon receipt of the letter.[12]

And indeed, the procedures mandated by Article 75 were followed. In fact, Plaintiff herself triggered them, by filing a

---

**11.** Plaintiff argues that the Orange County–CSEA collective bargaining agreement for 2000–2002 does not apply to her because it "was not adapted by parties until August 11, 2000, after the trouble with the Plaintiff's employment arose." (Pl. Brief at 18.) However, the 1997–1999 version of the agreement (which I requested from the parties and obtained from Defendants) provides for the exact same disciplinary procedures under Article 29 (including references to Civil Service

Law § 75), as does the 2000–2002 version. Therefore, at all relevant times Plaintiff was subject to the same leave, absence and disciplinary procedures. She does not suggest otherwise.

**12.** The record indicates that Plaintiff at some point tried to contact her union representative, but was unsuccessful. The record does not indicate when those contacts were made or over how long a period.

response to the August 31 letter on September 5, well within the 8 day window. In that response, she stated that she believed she was on a medical leave due to her pregnancy and added, "I am clearly stating to you I did not abandon my post." Two days later, after receiving what it reasonably interpreted as Plaintiff's objection to discipline, Commissioner Smith ordered that a Section 75 hearing take place. Since § 75 provides only for pre-termination hearings, it follows that Plaintiff had not been terminated without a hearing.

Pellegrino was not ignorant of the fact that the County had convened a Section 75 hearing. Col Catletti advised Plaintiff about the hearing on October 4, 2000, and Plaintiff acknowledges that she received this notification (Deposition of Judith Pellegrino, p. 52:4–21, attached to 12/17/04 Worthy–Spiegl Aff. as Exh. B). Plaintiff also received two letters, from Smith (November 20, 2000) and Zanetich (December 20, 2000), stating that she was still a county employee and directing her to return to work—letters that are themselves inconsistent with Plaintiff's claim that she had been fired. Plaintiff responded to the first letter by asserting for the first time her contention that she had been fired on August 31, 2000.[13] She responded to the second-letter by asking for no further contact "pending the outcome of the hearing"— affirmative evidence that she knew she had triggered her rights under Section 75. Her explanation for refusing to return to work after receipt of the December 20 letter— she "found the letter most offensive"—is, of course, no explanation at all, but it does not suggest that she had been terminated.

Moreover, there was a hearing. Pellegrino was given every opportunity to be heard and to present witnesses. She chose not to participate. Pellegrino was given an additional opportunity to mitigate the proposed penalty by submitting any exculpatory evidence to the hearing officer before she rendered a final decision. She again declined.

Thus, in view of all the evidence, no reasonable juror could conclude that Plaintiff was actually fired without a pre-termination hearing.

**B.  Timeliness of the Pre–Termination Hearing**

In addition, the notice, which commenced the Section 75 process, was served within the statutory 18–month period. *Matter of Steyer,* 70 N.Y.2d 990, 993, 993 526 N.Y.S.2d 422, 423, 521 N.E.2d 429 (1988) (disciplinary charges must be filed within 18 months of asserted wrongful conduct); *Nagle v. Bratton,* 245 A.D.2d 122, 122, 665 N.Y.S.2d 886, 886 (1st Dep't.1997) (same). The Section 75 hearing was ordered on September 7—less than two months after the misconduct began. The hearing commenced on October 30, 2001, still less than eighteen months after Pellegrino's authorized leave expired on July 15, 2000 and her misconduct (being absent without leave) began. Thus, the hearing was timely.

**C.  Post–Suspension Salary**

Finally, Plaintiff alleges in her motion papers that Defendant also violated Civil Service Law § 75(3) by failing to pay her salary following the expiration of her 30–day suspension. No such claim was

**13.** Plaintiff asserted in that same letter that no one had been in contact with her since August 31, 2000. However, at her deposition she acknowledges that Col Catletti contacted her three times in October—on October 4 (to notify her of the hearing), October 11 (postponing the hearing until December 13) and October 19 (rescheduling the hearing for December 13). (Pellegrino Deposition Transcript, 12/17/02 Worthy–Spiegl Aff. Exh. B.)

asserted in Plaintiff's pleadings and the time for amending those pleadings has long since passed.[14] Moreover, any such amendment would be futile.

Section 75(3) guarantees that a civil servant who finds himself on involuntary suspension pending discipline cannot be strung along indefinitely without pay. It guarantees the employee that he will collect his salary if the pre-termination hearing is not held within the thirty-day period. However, the protection afforded by § 75(3) is for the employee who wants to work but is not doing so because the employer will not permit it. For example, in *Levine v. New York City Transit Authority*, 70 A.D.2d 900, 417 N.Y.S.2d 307 (2d Dep't.1979), the court found that a hearing was not timely commenced against a Transit Authority employee for the purpose of § 75(3) where a prosecutor requested the delay pending the disposition of criminal charges against the employee, who wanted to return to work.

Here, Mrs. Pellegrino did not want to come to work. In fact, she repeatedly refused to come to work. She refused to come to work in July and August, when she was ordered to do so, and she refused again in November and December, when she was ordered to do so again.

Nothing in § 75(3) compels a public employer to pay a salary to an employee who remains on unpaid leave after it expires, and who then refuses to come back to work when ordered to do so. The Civil Service Law is designed to put the public employee in as good a position as he would have been if his claim were resolved within

thirty days.[15] It was not designed to give a windfall to an employee who does not come to work by her own choice.

Thus, there is no evidence in the record that Pellegrino was terminated without notice of a hearing, without a hearing, or without having the opportunity to participate in the hearing. Accordingly, Defendant is entitled to summary judgment dismissing Plaintiff's Civil Service Law § 75 claim.

## CONCLUSION

Defendant's motion for summary judgment on Plaintiff's federal and state discrimination claims is denied. Defendant's motion for summary judgment dismissing the § 75 Civil Service Law claim is granted. Plaintiff's motion for summary judgment is denied in its entirety.

This constitutes the decision and order of the Court.

---

14. The Consent Scheduling Order provides that "No amendments to the pleadings will be permitted after October 8, 2002, unless necessary to conform to evidence established through discovery." Because Plaintiff was plainly aware of her Section 75(3) claim as early as the date of her December 22, 2000 letter, she cannot claim that any new evidence entitles her to amend.

15. Interestingly, the claim does not have to be resolved within 30 days. The employer has up to 18 months within which to commence the actual hearing. *Matter of Steyer*, 70 N.Y.2d at 993, 993 526 N.Y.S.2d at 423, 521 N.E.2d 429.